# Illinois Official Reports

## Appellate Court

---

### *People v. VanderArk*, 2015 IL App (2d) 130790

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GORDON L. VANDERARK, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-0790 |
| Filed | December 23, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-CF-2677; the Hon. George J. Bakalis, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas A. Lilien and Mark G. Levine, both of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, the defendant, Gordon L. VanderArk, was convicted of three counts of solicitation of murder for hire (720 ILCS 5/8-1.2 (West 2010)) and was sentenced to a total of 40 years' imprisonment. On appeal, the defendant argues that the trial court erred in denying his motions to (1) suppress evidence and (2) appoint a special prosecutor. We affirm.

¶ 2                                    BACKGROUND

¶ 3    In 2010, Judge Blanche Hill Fawell sentenced the defendant to 22 years' imprisonment for aggravated driving while his license was revoked (DWLR) (625 ILCS 5/6-303(a), (d-5) (West 2008)) and aggravated driving while under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(1), (d)(2)(E) (West 2008)). The State, represented by Du Page County Assistant State's Attorney (ASA) Audrey Anderson, argued that the defendant should receive a greater sentence of 27 years' imprisonment.

¶ 4    In September 2011, Centralia Correctional Center inmate Harold Meyers, Jr., sent a letter to Judge Fawell indicating that a fellow inmate, the defendant, wanted her killed. Meyers explained that the defendant hated her and had a "hit list" naming: (1) her; (2) Anderson; (3) the defendant's ex-wife, Tina Wiggens; (4) Wiggens' new boyfriend; and (5) the man who held the defendant's power of attorney, Richard Temes. Meyers' letter included addresses and various details about the lives, relationships, and habits of those on the list.

¶ 5    Judge Fawell turned Meyers' letter over to the sheriff's department, which opened an investigation in conjunction with the Du Page County State's Attorney's office. Pursuant to an overhear authorized by Judge Kathryn Creswell, Meyers wore a wire on October 19, 2011, and recorded his conversations with the defendant about the murder-for-hire scheme.

¶ 6    In the recorded conversations, the defendant described in detail how he wanted Meyers to kill the people on the list. He also wanted Meyers to kill anyone else present at the time of the murders, including Judge Fawell's husband and children. The defendant repeatedly told Meyers that he was serious.

¶ 7    On November 14, 2011, ASA Timothy Diamond presented Judge Creswell with a petition for a writ of *habeas corpus* in the defendant's DUI case. The defendant's vehicle had been the subject of a forfeiture proceeding after the DUI, and the forfeiture was achieved by a default judgment against the defendant. The defendant, however, was unaware of this and repeatedly inquired about the status of his vehicle. The State informed Judge Creswell that the writ would be used, in part, to get the defendant out of the Illinois Department of Corrections (IDOC) for an interview about the murder-for-hire scheme. In addition, the defendant was to be told that his car had been forfeited. The State explained that it did not want to interview the defendant in Centralia, which might put Meyers' safety in jeopardy. The State also did not want the defendant to be suspicious about why he was being brought to Du Page County, so the writ was to seem innocuous on its face.

¶ 8    On November 15, 2011, Meyers wore a wire a second time and recorded more discussions with the defendant about the murder-for-hire plot.

¶ 9    On November 16, 2011, the defendant was brought to the Du Page County courthouse. The Centralia guards brought the defendant through the main doors of the courthouse. They then entered Judge Fawell's courtroom through the front door, where the general public comes in,

rather than through the jail facility. This constituted a security breach. As such, Judge Fawell left the courtroom and the defendant was escorted from the courtroom through the jail.

¶ 10 The defendant was then interviewed. He was confronted with the recording of his conversations with Meyers and various documents, including a "hit list" and a promissory note to Meyers, dated February 28, 2011. The promissory note indicated that $70,000 was to be paid by Temes from the defendant's account, with $2,000 being paid as a down payment. The defendant acknowledged that he had made the documents, but he stated that the $2,000 was for 24 watercolor paintings that he had purchased from Meyers and that the $70,000 was to be paid to Meyers for his services in collecting money from Temes.

¶ 11 Following the interview, the defendant was charged with multiple counts of solicitation of murder for hire, with the intended victims alleged to be Judge Fawell, Anderson, Wiggens, and Temes.

¶ 12 The defendant thereafter filed a motion for the appointment of a special prosecutor. The defendant argued that the Du Page County State's Attorney's office was interested in the case and must be disqualified from prosecuting the case, because Anderson was one of the alleged intended victims. The trial court (Judge George Bakalis) denied the motion, explaining that there was no appearance of impropriety simply because Anderson was an alleged victim in the case.

¶ 13 The defendant also filed two motions to suppress the statements he made during the interrogation. In one motion, he argued that the State had used a false writ of *habeas corpus*. In his second motion, the defendant alleged that his statements were involuntary. The trial court denied the motions, explaining that, even if there had been a violation of the Habeas Corpus Act (Act) (735 ILCS 5/10-101 *et seq.* (West 2012)), the suppression of his statements was not an appropriate remedy.

¶ 14 The defendant thereafter filed a motion to reconsider, arguing that it was a due-process violation for Judge Creswell to have signed the *habeas* writ knowing that the "document was a subterfuge." He alleged that Judge Creswell had engaged in misconduct. The defendant argued that he had a right to be "treated fairly" and that his constitutional right "surrounding" the Act had been infringed.

¶ 15 At a hearing on the motion to reconsider, the trial court asked how the issue of the vehicle forfeiture had been raised by the defendant. The State explained that the defendant had raised the issue when talking with Meyers and had raised it in some letters. The trial court then considered an affidavit that Judge Creswell had written. Judge Creswell averred that the State had informed her that the basis of the *habeas* writ was that the defendant had written several letters inquiring into the disposition of his vehicle and that those letters had never been addressed. Judge Creswell further averred that the State had also informed her that law enforcement officers wanted to speak to the defendant at the Du Page County courthouse complex about the murder-for-hire investigation.

¶ 16 Following the hearing, the trial court entered a written order denying the motion to reconsider. The trial court explained that the police and the Du Page County State's Attorney's office had concocted a scheme where the defendant would be brought to Du Page County by a ruse. The State prepared a petition that alleged that the defendant had been charged with DUI and was to be brought to court for status on the return of his vehicle. The trial court found that "in truth" no DUI prosecution was pending against the defendant and nothing was pending regarding the return of his vehicle, on which forfeiture proceedings had already occurred. The

defendant had made no requests to attend court for any such status. The trial court further found that the State had failed to inform Judge Creswell that there was no case pending against the defendant and that the forfeiture of his vehicle had already taken place. The trial court determined that the State's deceptive actions had led to the writ being improperly issued. Nonetheless, the trial court found that the State's actions did not "rise to the level of such egregious conduct to warrant suppression of an otherwise voluntary statement."

¶ 17     On May 8, 2013, the trial court conducted a jury trial. Meyers testified that he and the defendant spoke frequently while in Centralia. The defendant was upset with Temes, who was taking care of his finances. He was upset with Wiggens, who was a "gold digger" and was taking his money while having an affair with another man. He was also upset with Judge Fawell and with Anderson. He hated both of them and would get red-faced when he talked about them.

¶ 18     According to Meyers, the defendant asked him if he had ever killed anyone. Meyers replied that, if he had, he would not tell the defendant. The defendant told him that "he had some jobs that he needed to get done," which Meyers understood to mean that the defendant wanted him to "eliminate" or "threaten" someone. The defendant then showed him a "hit list," which included Judge Fawell and her husband, Wiggens and her boyfriend, and Wiggens' brother and his daughters. The defendant explained that he wanted Meyers to kill the people on the list after Meyers was released from prison.

¶ 19     Meyers testified that he was to be paid $70,000 for the murders, with $2,000 paid as a down payment to show good faith. The defendant had Temes transfer $2,100 into Meyers' prison trust account. The remainder was to be paid after the murders.

¶ 20     Meyers explained that, because he wanted a receipt for the money, he and the defendant came up with the idea that the receipt would show that the money had been for watercolors that Meyers had painted. Although he received a receipt, Meyers did not give any watercolors to the defendant or Temes.

¶ 21     Meyers testified that he wrote a letter to Judge Fawell after he realized that the defendant was serious about wanting her killed. After being approached by the Du Page County State's Attorney's office, he agreed to wear a recording device and tape some of his discussions with the defendant. The court admitted these recordings into evidence. Meyers testified that he received no money or sentence reduction for his help with the prosecution.

¶ 22     Temes testified that he first met the defendant when they were both inmates in the Du Page County jail. The defendant asked him to help him with his finances and added his name as power of attorney to his Chase Bank account. Temes transferred $2,100 from the defendant's account to Meyers' account. Temes did not receive any watercolor paintings.

¶ 23     Michael Gardner testified that he was the defendant's cellmate at Centralia for seven or eight months. The defendant would talk many times a day about Wiggens and her boyfriend stealing his money. He wanted his money back. The defendant would get red in the face and raise his voice when he talked about Wiggens. Toward the end of their time as cellmates, the defendant began telling Gardner a couple of times a week that he wanted Wiggens to be killed painfully. He also wanted Anderson and Judge Fawell to be killed. Gardner believed that the defendant was serious, and he therefore wrote a letter to the State's Attorney.

¶ 24 Judge Fawell testified that she had been the presiding judge in the case in which the defendant was prosecuted for DUI and DWLR. She had sentenced him to 22 years' imprisonment. She acknowledged receiving a letter from Meyers.

¶ 25 Anderson testified that, at the time of the defendant's DUI prosecution, she was the first-chair supervisor in Judge Fawell's felony trial courtroom. She requested a longer sentence than the defendant received. She testified that the prosecutors in the present case, Joseph Lindt and Helen Kapas, had been ASAs in the same office with her for many years.

¶ 26 Investigator Robert Guerrieri testified about his videotaped interview with the defendant at the Du +Page County sheriff's office. The video of the interview was played for the jury over defense objection.

¶ 27 After the close of the evidence, the jury found the defendant guilty of soliciting the murders of Judge Fawell, Anderson, and Wiggens. The trial court sentenced him to 40 years' imprisonment for solicitation as to Judge Fawell, 35 years for solicitation as to Anderson, and 20 years for solicitation as to Wiggens. The trial court ordered that all of the sentences be served concurrently with each other but consecutively to his current sentence for DUI and DWLR. The defendant thereafter filed a timely notice of appeal.

¶ 28                                    ANALYSIS

¶ 29 The defendant's first contention on appeal is that the trial court erred in denying his first motion to suppress. Specifically, the defendant argues that the State tricked Judge Creswell into issuing a false writ so that he could be interrogated in Du Page County. The defendant contends that, because the State's conduct was so outrageous, his statements should have been suppressed.

¶ 30 In response, during oral argument, the State acknowledged that some of its actions during the proceedings could have been considered inept. The State acknowledged that it would have been better to inform Judge Fawell on the day the defendant was due in court that he was going to be there. The State also acknowledged that there was no reason that Judge Fawell had to be the judge to inform the defendant about the status of his vehicle. Had either Judge Fawell been informed that the defendant would be in her courtroom or the matter been scheduled before a different judge, the State suggests, the defendant would have been informed about the status of his vehicle just as the writ indicated. We note further that, had the State arranged to record the proceedings before Judge Creswell on November 14, 2011, the confusion relating to what she was informed would have been eliminated.

¶ 31 We need not delve into whether the State's actions constituted intentional deception or mere ineptitude because, even if Judge Creswell was tricked into issuing a writ pursuant to the Act, the defendant still would not be entitled to any relief. The IDOC has been granted sole discretion in placing, handling, and transferring inmates within its control. *People v. Freed*, 328 Ill. App. 3d 459, 465-66 (2002). The legislature has given the IDOC the power to assign inmates to any of its facilities, and the IDOC has been charged with the responsibility of maintaining programs of control and rehabilitation for inmates within its facilities. 730 ILCS 5/3-2-2(1)(b), (1)(d) (West 2012). Recognizing the IDOC's responsibility for placing and controlling inmates within its facilities, the legislature enacted the Act (735 ILCS 5/10-101 *et seq*. (West 2012)) to set forth the proper procedure for bringing an inmate before the trial court. The trial court may enter a *habeas* order to have the inmate: (1) testify; (2) be surrendered in discharge of bail; (3) attend the inmate's own criminal proceedings; and (4)

testify in out-of-state criminal proceedings. *Freed*, 328 Ill. App. 3d at 466. If the Act is not complied with and an inmate is not transferred for proper reasons, the affected transferring agency may be entitled to up to $300. 735 ILCS 5/10-131 (West 2012). The Act does not specifically confer any rights upon the inmate. See *People v. Harris*, 182 Ill. 2d 114, 150 (1998).

¶ 32    In *Harris*, an ASA had a " 'jail letter' " issued requesting that the director of the Cook County jail transfer the defendant from the jail to the Chicago police department. The letter indicated that the defendant was wanted for a criminal investigation unrelated to any case pending against the defendant. However, upon being transferred, the defendant was placed into a police lineup regarding a murder in which he was allegedly involved. The defendant subsequently gave authorities two statements regarding his role in the murder at issue. *Id.* at 148-49.

¶ 33    The defendant filed a motion to suppress his statements on the basis that he had been transferred from the jail to the police station, in violation of the Act. *Id.* at 148. The trial court denied the defendant's motion and the supreme court affirmed. The supreme court held that the Act did not give rise to a protected interest sufficient to warrant suppression of evidence obtained in violation of the Act. *Id.* at 150. The supreme court explained:

> "Without deciding precisely what sort of protected interest the Habeas Corpus Act might give rise to [citation] and what sort of remedy is necessary for its violation, we do not believe that suppression is an appropriate consequence here. Neither the Habeas Corpus Act nor the County Jail Act is aimed at the sort of police misconduct that would warrant suppression of the defendant's statements. *** [T]he police had legitimate reasons to transfer the defendant to *** where the investigation was centered and where they could conduct a lineup." *Id.*

¶ 34    Here, as in *Harris*, any purported violation of the Act did not implicate any of the defendant's constitutional rights. Therefore, as in *Harris*, the defendant was not entitled to a suppression of his statements, based on the violation of the Act. The trial court therefore did not err in denying the defendant's motion to suppress his statements.

¶ 35    The defendant argues that this case is distinguishable from *Harris* because *Harris* did not involve a trial court judge being tricked into issuing a false writ. Even if we were to accept the defendant's premise that the State's conduct was so outrageous that his statements should be suppressed, the defendant would still not be entitled to any relief, because his statements did not affect the outcome of his trial. See *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (if a constitutional error occurs at trial, a reviewing court must determine whether the trial court's error was harmless beyond a reasonable doubt). Here, the evidence against the defendant was overwhelming. The State's evidence included: (1) Meyers' detailed testimony about the solicitation-of-murder scheme; (2) the recordings in which the defendant himself talked about the scheme; (3) the "hit list" that the defendant wrote about whom he wanted killed; (4) the written receipt and promissory note for the scheme; (5) Temes' testimony about the financial transactions between the defendant and Meyers; and (6) Gardner's testimony that the defendant told him that he wanted Judge Fawell, Anderson, and Wiggens killed. Further, the statements the defendant wanted to suppress did not implicate him in the solicitation-of-murder scheme but instead provided an innocent explanation of why he was transferring money to Meyers. For all these reasons, the defendant's argument that his statements should have been suppressed is without merit.

¶ 36    The defendant's second contention on appeal is that the trial court abused its discretion in denying his motion to appoint a special prosecutor. The defendant argues that there was an appearance of impropriety, because Anderson worked for the prosecuting agency and was a coworker of the prosecuting attorneys.

¶ 37    Article VI, section 19, of the Illinois Constitution provides for the election of a State's Attorney in each county. Ill. Const. 1970, art. VI, § 19. The powers and duties of a State's Attorney include commencing and prosecuting all actions, civil and criminal, in which the people of the state might be concerned. 55 ILCS 5/3-9005(a)(1) (West 2012). However, when a State's Attorney is interested in any cause or proceeding, civil or criminal, that he or she has a duty to prosecute, the court may appoint some other competent attorney to prosecute such cause or proceeding. 55 ILCS 5/3-9008 (West 2012).

¶ 38    There are three situations in which the State's Attorney could be considered interested so as to authorize the appointment of a special State's Attorney. *People v. Lang*, 346 Ill. App. 3d 677, 681-82 (2004). Those three situations are where (1) the attorney is interested as a private individual in the litigation; (2) the attorney is an actual party to the litigation; or (3) the attorney's involvement creates the appearance of impropriety in the prosecution of the defendant. *Id.* However, even if there is a concern about the appropriateness of the State's Attorney's office prosecuting a case against a particular defendant, that concern must be weighed against countervailing considerations. See *People v. Shick*, 318 Ill. App. 3d 899, 907 (2001). Such countervailing considerations include (1) the burden that would be placed on the State's Attorney's office if the entire office had to be disqualified; (2) how remote the connection is between the State's Attorney's office and the alleged conflict of interest; and (3) to what extent the public is aware of the alleged conflict of interest. *Lang*, 346 Ill. App. 3d at 683. The decision to appoint a special prosecutor rests within the sound discretion of the trial court. *People v. Polonowski*, 258 Ill. App. 3d 497, 503 (1994).

¶ 39    Applying all of these principles to the instant case, we hold that the trial court did not abuse its discretion in denying the defendant's motion for the appointment of a special prosecutor. The defendant provides no reason why a new special prosecutor should have replaced the Du Page County State's Attorney's office, other than that Anderson was an ASA herself. The defendant argues that that fact created an appearance of impropriety. However, that standing alone is not a reason to disturb the trial court's decision. In *People v. Morley*, 287 Ill. App. 3d 499, 505 (1997), we rejected a similar argument, explaining:

> "The State's Attorney's responsibilities are not limited to representing the people of the State who are not employed by the State of Illinois or some other governmental entity. These prosecutorial responsibilities will occasionally include prosecuting cases where victims and witnesses are employed by a state, county, or local agency, including, but not limited to, the State's Attorney's office. Furthermore, the State's Attorney does not represent individuals or specific witnesses during the course of criminal prosecutions. Criminal prosecutions are commenced in the name of and on behalf of the people of the State of Illinois. To hold that a special prosecutor must always be appointed whenever a victim or witness is employed by a state, county, or local agency would be an illogical, as well as impractical, encroachment upon the authority of a constitutional officer." *Id.*

¶ 40    We further note that it is not necessarily improper for an ASA to testify as a witness in a case that her office is prosecuting. See *People v. Tracy*, 291 Ill. App. 3d 145, 150-51 (1997). In

*Tracy*, the defendant's daughter was issued a citation for illegally passing a school bus. At the first court appearance on the citation, the defendant informed an ASA that she had been driving the vehicle that illegally passed the school bus. Charges were subsequently filed against the defendant. Upon learning that the ASA would be a witness against her, the defendant filed a motion seeking the appointment of a special prosecutor. The trial court denied the motion, and the reviewing court affirmed. *Id.* at 149-51. The reviewing court explained that a special prosecutor was not needed, because the ASA who testified was not the complaining witness against the defendant. *Id.* at 151.

¶ 41    Here, in order to establish that the defendant had committed solicitation of murder for hire, the State was required to establish that the defendant (1) intended that a first-degree murder be committed and (2) procured another "to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2012). As Anderson's testimony could establish neither of those elements of the offense, she was not a complaining witness against the defendant. Therefore, as in *Tracy*, the trial court did not abuse its discretion in declining to appoint a special prosecutor.

¶ 42    The defendant argues that the instant case is more analogous to *Lang*. We find his reliance on that case to be misplaced. In *Lang*, after a hearing related to the defendant allegedly driving with a revoked license, the prosecutor followed the defendant out of court, saw him drive away from the courthouse, and contacted police to inform them that the defendant was driving without a license. *Lang*, 346 Ill. App. 3d at 678-79. The prosecutor then continued to prosecute the case up until trial, when another attorney from the State's Attorney's office prosecuted the case. The prosecutor who witnessed the alleged crime was the State's chief witness at trial. *Id.* at 679.

¶ 43    On appeal, we found that the trial court abused its discretion by declining to appoint a special prosecutor. *Id.* at 684. We explained that, "[a]lthough the [prosecutor's] pursuit of the defendant was not wrong in itself, his aggressive behavior toward the defendant created the appearance that the State's Attorney's office was obsessed with finding evidence against the defendant to obtain a conviction against him at all costs." *Id.* We further explained that a prosecutor becoming a witness would not necessarily require his entire office to be disqualified, but that the specific facts in *Lang*, which "significantly" included the prosecutor affirmatively working to catch the defendant in a crime and then becoming the key witness in the prosecution, warranted disqualification. *Id.* at 685-86.

¶ 44    Here, unlike the primary witness in *Lang*, Anderson did not demonstrate any aggressive behavior toward the defendant that suggested she was obsessed with obtaining a conviction against him at all costs. Further, she was not involved in the defendant's instant prosecution. Additionally, as noted above, her testimony was not even needed to prosecute the defendant. For these reasons, *Lang* does not require us to reach a different result in this case.

¶ 45                                          CONCLUSION
¶ 46    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 47    Affirmed.