2021 IL App (1st) 180672
No. 1-18-0672
Opinion filed March 22, 2021

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No 14 CR 00994 (01) |
| | ) | |
| BRANDON JACKSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant | ) | Paula M. Daleo, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker concurred in the judgment and opinion.
Justice Coghlan dissented, with opinion.

**OPINION**

¶1    A jury appears to have found Brandon Jackson guilty of first degree murder for the shooting

death of Cuauhtemoc "Temo" Estrada and attempted armed robbery of Rigoberto Anaya. We say

"appears" because, after the jury returned its signed verdict forms, Jackson's counsel requested the

trial court poll the jury. The trial court asked 11 of the jurors, "Was this then and is this now your

verdict?" Of the 11 jurors the court polled, all responded "yes." The court then dismissed the jury

without polling the twelfth juror.

¶2 The parties do not dispute that the trial court erred by failing to poll the twelfth juror. Nor do the parties dispute that Jackson's counsel forfeited review of the issue by (i) failing to object before the trial court dismissed the jurors and (ii) failing to include the alleged error in a posttrial motion. We address a narrow issue: Does the trial court's error in failing to poll all 12 jurors constitute second-prong plain error, excusing Jackson's forfeiture and requiring reversal of the trial court's judgment?

¶3 We hold that leaving out of the poll of the jury even one juror calls into question the integrity of the judicial process and, so, constitutes second-prong plain error. We reverse and remand for a new trial.

¶4 We do not arrive lightly at the decision. The offense was violent; for the witnesses and Estrada's family, the trial was a traumatic process. As the trial court pointed out, Estrada's family regularly attended court for the four years this case progressed. The victim impact statements presented at sentencing reveal the deep emotional toll Estrada's murder has taken on those who knew him. We acknowledge the difficulty in subjecting Estrada's family and the other witnesses to a retrial for what may appear an oversight. Nonetheless, the inviolable right to be tried by an impartial jury of one's peers stands as an uncontested cornerstone of our criminal law system. Failing to ensure that even a single juror's verdict "was [ ] then and is [ ] now your verdict" damages that essential and durable cornerstone.

¶5                                     Background

¶6 We recount the facts of Jackson's offense briefly because Jackson raises no issue concerning the sufficiency or the closeness of the trial evidence.

¶7 The victim, Cuauhtemoc "Temo" Estrada, rented out the hall at a Veterans of Foreign Wars (VFW) post for a Christmas party on December 20, 2013. Rigoberto Anaya, who was dating

2

Temo's daughter Christina, arrived at the VFW at about 7:40 p.m. Before the couple could make it inside, two men came up to them and demanded that Anaya "give [them] all [his] shit." Anaya saw both men carried guns. Temo came over to find out what was going on and reached for his weapon, telling the offenders he was an officer. As soon as Temo reached for his gun, one of the men shot at him. Christina's testimony was substantially similar to Anaya's.

¶8       Temo's son, Daniel, who had arrived at the VFW earlier that evening, had gone outside to help Temo. Daniel and Temo saw Anaya and Christina "being held up" by two men. Daniel watched as Temo walked up to the two men to "see what was going on," and the next thing he knew, Temo had been shot. After the shooting, the two men ran from the scene. Temo did not survive.

¶9       The State introduced evidence that Jackson told a friend, Ronald Jones Jr., "he had tried to rob somebody at the bar" but that he "didn't mean to shoot the person." Jackson reportedly said that someone had come out of the VFW with a gun and Jackson "shot [his] gun at the victim." After listening to recordings of Jackson's phone calls from the Piatt County Jail, officers eventually located the gun used in the shooting. Although no fingerprints were found on the gun, officers found the gun where Jackson had said "the unit was."

¶10      After closing arguments, the jury retired for deliberation at 12:21 p.m. At 2:11 p.m. the jury sent out a question asking to "get the legal definition of reasonable doubt." By agreement of the parties, the court answered, "Keep deliberating. You have all the instructions and the evidence." At 3:42 p.m. the jury sent out another question: "Can we get a numbered evidence list? If not, can we get a clarification if Exhibit 38 is Gage Thornton or Brandon Jackson?" By agreement of the parties the court answered, "Exhibit No. 38 is Gage Thornton." As deliberations

3

continued, the parties agreed that, should the jury continue until 9:00 p.m., they would be excused to return the next day. But the jury came to a verdict.

¶11 The jury found Jackson guilty of first degree murder and guilty of attempted armed robbery. The jury also found the allegation that Jackson personally discharged a firearm during the offense had been proven. The verdict forms have 12 unique signatures. At counsel's request, the court polled the jury using the question, "Was this then and is this now your verdict?" The court only posed the question to 11 of 12 jurors. All 11 responded, "Yes." The court discharged the jury without any further comment from Jackson's counsel.

¶12 Jackson's counsel filed a motion for a new trial raising several claims of error but included nothing about the trial court's failure to poll all 12 jurors. The trial court denied the motion.

¶13 The trial court conducted an extensive sentencing hearing where both parties presented substantial evidence in aggravation and mitigation. In imposing sentence, the trial court commented:

> "What is the right sentence here for everybody? That is my job to try to determine, to try to balance what I have heard about the defendant, his upbringing, his experiences in life, his choices that he made to the life of Mr. Estrada who served this country—and I'm just making these comments. He served his country as a Marine. He served[d] his country as a sheriff. He was a family man. He was a person who commanded respect from the people that he came into contact with.

¶14 The court then juxtaposed Estrada's family, whom the court characterized as "God-fearing people," with Jackson's family, who "tried [their] best" to prevent Jackson from "suffer[ing] the

4

consequences" of his choices. Overall the trial court made extensive findings and sentenced Jackson to 55 years in prison for first degree murder and 5 years in prison for attempted robbery.

¶15 The State asked for clarification on whether the court's 55-year sentence included the 25-year firearm enhancement. Both parties agreed the judge should make explicit the underlying sentence in addition to the enhancement, which would make Jackson's sentence 30 years for first degree murder plus 25 years for the firearm enhancement. The court responded: "Then that's not the appropriate sentence. It would have—okay. So it would have to be 35 years on the murder plus 25 years on the enhancement plus 5 years on the attempt robbery." The sentencing order reflects a 60-year sentence for first degree murder to run consecutively with a 5-year sentence for attempted armed robbery for a total of 65 years in prison.

¶16 Jackson's counsel filed a motion to reconsider his sentence, alleging the court had no basis to "change[ ] its sentence from 55 years to 60 years on the murder counts" without presentation of additional aggravation or mitigation. The trial court denied counsel's motion.

¶17                                          Analysis

¶18 Jackson raises two arguments. First, he argues the trial court erred in polling less than all jurors. The State does not dispute that the incomplete polling was error; instead, the State argues Jackson forfeited the issue and claims the error was not serious enough to warrant a new trial under the second prong of the plain error doctrine. Jackson also challenges two aspects of his sentence, arguing (i) the trial court erred in considering the victim's characteristics as an aggravating factor and (ii) the trial court erred in "capriciously" increasing Jackson's sentence to 60 years after it had first imposed a sentence of 55 years.

¶19 We agree that failing to poll the entire jury constitutes error and, disagreeing with *People v. McGhee*, 2012 IL App (1st) 093404, we find the error serious enough to be considered second-prong plain error. We reverse and remand for a new trial.

¶20 At the outset, Jackson acknowledges he forfeited his claim by failing to object at the time of jury polling and failing to include the claim of error in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both contemporaneous objection and posttrial motion raising issue required to preserve issue for appeal). By Illinois Supreme Court Rule, we can address forfeited errors "affecting substantial rights." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the rule, a defendant can show plain error one of two ways: (i) where the error is clear and obvious and the evidence is closely balanced such that the error alone threatened to tip the scales of justice against the defendant or (ii) when an error is clear and obvious and the error itself is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. Under the second prong, we assume prejudice because of the seriousness of the error. *Id.* ¶ 50. Jackson does not claim the evidence is closely balanced. He argues that the trial court's failure to poll all the jurors qualifies as second-prong plain error and requires reversal.

¶21 Traditionally, the first step of a plain error analysis involves determining whether a clear or obvious error occurred. *Id.* ¶ 49. The State does not dispute that polling only 11 members of a 12-person jury is error, nor is there much room for a dispute. Our supreme court has used mandatory language to describe the trial court's obligation to conduct a poll once requested. *People v. Williams*, 97 Ill. 2d 252, 307 (1983) (when trial court conducts poll, it "*must* determine that the jury verdict accurately reflects each juror's vote as reached during deliberations and that the jurors' votes were not the result of force or coercion" (Emphasis added.)). The court's obligation inheres

6

to each juror individually. *Id.* True, we defer to the trial court on many aspects of the polling process. See *People v. Kellogg*, 77 Ill. 2d 524, 528 (1979) (trial court "may use its discretion" in formulating polling question); *People v. Cabrera*, 116 Ill. 2d 474, 490 (1987) (trial court's conclusion about voluntariness of assent to verdict will not be disturbed unless "clearly unreasonable"). But the failure to complete the poll does not fall within the trial court's discretion. Polling less than all jurors constitutes error.

¶22 The parties disagree, however, as to the nature of the error. Jackson argues the trial court's failure to poll all the jurors amounted to second-prong plain error; the State, relying primarily on *McGhee*, argues the error does not rise to the level required to excuse Jackson's forfeiture.

¶23 First, we need to explain *McGhee* in some detail. There, the defendant appealed a second-stage dismissal of his postconviction petition alleging, in part, that his direct appeal counsel had been ineffective for failing to raise a claim about the trial court's failure to poll the jury at his request. *McGhee*, 2012 IL App (1st) 093404, ¶¶ 7, 14. After the jury found the defendant guilty of first degree murder, attempted murder, and aggravated discharge of a firearm, the trial court dismissed the jurors before polling them, despite counsel's request that the jury be polled. *Id.* ¶ 17. There, as here, the defendant's jury polling claim would have been forfeited on direct appeal, and appellate counsel could only have been ineffective for failing to raise the claim if it constituted second-prong plain error. *Id.* ¶¶ 18, 20.

¶24 The court began its analysis by "equat[ing] the second prong of the plain-error doctrine with structural error," which is described as " 'systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Id.* ¶ 20 (quoting *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010)). Because the application of second-prong plain error for failure to poll the jury had not yet been addressed in Illinois, the court looked for

7

guidance in Illinois Supreme Court cases analyzing trial court error during *voir dire*. *Id.* ¶ 21 (discussing *Thompson* and *People v. Glasper*, 234 Ill. 2d 173 (2009)). In *Glasper*, for example, our supreme court found the failure to properly question the venire under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) implicated only a supreme court rule, not a "fundamental right or other constitutional protection." *McGhee*, 2012 IL App (1st) 093404, ¶ 22 (citing *Glasper*, 234 Ill. 2d at 193). The court in *McGhee* used that reasoning to draw a distinction "between the procedural requirement of questioning the venire *** and the fundamental prohibition against a defendant being tried by a biased jury." *Id.* ¶ 23.

¶25    Extending the logic of *Glasper* to the context of jury polling, the court in *McGhee* separated the defendant's right into two discrete parts: (i) the "substantive" right to a unanimous verdict and (ii) the "procedural" right to ensure unanimity by jury polling. *Id.* ¶¶ 24-25. In the court's view, because jury polling was not the only mechanism by which to ensure a unanimous verdict, it embodied a "procedural device" and "not an indispensable prerequisite to a fair trial." *Id.* ¶ 25. Ultimately, the court held that, absent other evidence the jury's verdict was not unanimous, the trial court's failure to poll the jury was not enough to satisfy the second prong of plain error. *Id.* ¶ 26.

¶26    We disagree with *McGhee*'s conclusion. To start, the court in *McGhee* operated under a misconception about second-prong plain error. Early in its analysis, the court equated the second prong of Illinois's plain error doctrine with "structural error." *Id.* ¶ 20. In the federal system, the United States Supreme Court has limited structural errors to (i) the complete denial of counsel, (ii) trial before a biased judge, (iii) racial discrimination in grand jury selection, (iv) denial of the right to self-representation at trial, (v) denial of a public trial, and (vi) a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2

(2006)). Our supreme court had tacitly recognized other second-prong plain errors that were not on the Supreme Court's list of structural errors and stated that "we did not restrict plain error to the types of structural error that have been recognized by the Supreme Court" in *People v. Clark*, 2016 IL 118845, ¶¶ 45-46. The supreme court's express clarification of the nature of second-prong plain error in *Clark* extensively undercuts *McGhee*'s precedential value.

¶27    As a matter of law, we find it difficult to reconcile *McGhee*'s holding with the language our courts have used to describe the right to jury polling, much of which *McGhee* itself quoted. In Illinois, parties to lawsuits and defendants in criminal cases have "an absolute right" to poll the jury. *People v. Rehberger*, 73 Ill. App. 3d 964, 968-69 (1979). Indeed that "absolute right" is "basic to our system which requires unanimity among the jurors." *Id.* at 968. *McGhee* notably did not quote, however, our supreme court's decision in *Kellogg*, where the court explained at length:

> "Jurors must be able to express disagreement during the poll or else the polling
>
> process would be a farce and the jurors would be bound by their signatures on the
>
> verdict. Before the final verdict is recorded, a juror has the right to inform the
>
> court that a mistake has been made, or to ask that the jury be permitted to
>
> reconsider its verdict, or to express disagreement with the verdict returned. ***
>
>     *** [A]n opportunity must be afforded for the juror to express his [or her]
>
> opinion free from coercive influences that may have dominated the deliberations of
>
> the jury room *** and a verdict cannot stand if the [trial court's] interrogation
>
> precludes the opportunity to dissent or if the record reflects that the juror in the poll
>
> has not in fact assented to the verdict." *Kellogg*, 77 Ill. 2d at 528-29.

The court used mandatory language, emphasizing that a verdict *cannot stand* if the trial court's poll somehow prevents a juror from expressing assent (or dissent) to the written verdict. *Id.* at 529.

¶28 Older cases, some almost as old as the State of Illinois itself, use similarly strong language. In *Nomaque v. People*, 1 Ill. 145 (1825), which *McGhee* cites, the court held that the right of a criminal defendant to have the jury polled was so important that it belonged exclusively to the defendant, meaning counsel could not waive it on the defendant's behalf by allowing the jury to be dismissed before polling. *Id.* at 148, 149-50. A right that is "basic to our system" sounds quite like a right whose denial would "affect[ ] the integrity of the judicial process." See *Clark*, 2016 IL 118845, ¶ 45 (reciting standard).

¶29 We next confront *McGhee*'s reliance on our supreme court's decisions in *Thompson* and *Glasper*, 234 Ill. 2d 173. In both cases, the court addressed the remedy for the trial court's failure to comply with Rule 431(b). *Thompson*, 238 Ill. 2d at 608-611; *Glasper*, 234 Ill. 2d at 189-203. Like *McGhee*, the analyses in *Thompson* and *Glasper* find resonance in the concept of structural error. *Thompson*, 238 Ill. 2d at 608-09 (discussing remedy for Rule 431(b) violation using language of structural error under a point heading labeled "Structural Error"); *Glasper*, 234 Ill. 2d at 197-98. After *Clark*, their utility as guidance is diminished.

¶30 More to the point, however, the nature of the errors in *Thompson* and *Glasper* (Rule 431(b) violations) fundamentally differs from the trial court's failure to poll every member of the jury after a verdict. Violation of Rule 431(b) is an instructional error occurring when the trial court fails to ask potential jurors if they "understand and accept" the four principles announced in *People v. Zehr*, 103 Ill. 2d 472 (1984). Our supreme court explained the reasons instructional errors like Rule 431(b) violations are better analyzed under the first prong of the plain error doctrine where the closeness of the evidence matters. *Sebby*, 2017 IL 119445, ¶ 78. Failure to properly instruct potential jurors creates only the "potentiality" of bias. *Id.* The risk that faulty instructions contributed either to bias or the ultimate result "depends upon the quantum of evidence presented

10

by the State against the defendant." (Internal quotation marks omitted.) *Id.* In other words, a juror who has incorrect notions about topics covered in Rule 431(b) may be influenced by those notions in a close case; on the other hand, if the evidence against the defendant is truly overwhelming, a juror with incorrect notions about Rule 431(b) principles will not have to rely on those notions in reaching a verdict.

¶31    Errors in jury polling differ categorically. The purpose of jury polling has less to do with weeding out bias and more to do with corroborating the accuracy of the written verdict. See *Kellogg*, 77 Ill. 2d at 528 (jury polling required to give "opportunity for free expression unhampered by the fears or the errors which may have attended the private proceedings of the jury room." (Internal quotation marks omitted.)); *Nomaque*, 1 Ill. at 150 (jury polling required because "the jury may vary from their first offering of their verdict"); *Rehberger*, 73 Ill. App. 3d at 968 (jury polling required to determine "whether the pronounced verdict is each individual juror's verdict"); see also *Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶ 61 ("purpose of polling a jury is to determine whether any individual jurors have been coerced by the other members of the jury into returning a certain verdict" (internal quotation marks omitted)). Even where evidence is not "closely balanced," as applied to first-prong plain error, a juror who harbors reasonable doubt as to guilt may sign a guilty verdict as a result of fear or coercive pressure attending private jury deliberations. Regardless, once a poll has been sought, every juror must be afforded the opportunity to disavow the verdict form.

¶32    Given the purpose of jury polling, we reject the State's argument, echoing the reasoning of *McGhee*, that polling the jury involves "merely a procedural device." Setting aside the characterization of any procedural protections as "mere" protections, jury polling is not only *a* procedural device designed to ensure the unanimity of the jury's verdict; it is *the* procedural device

11

for accomplishing that goal. The State, again echoing *McGhee*, argues other measures exist like "the requirement that the jurors individually sign the verdict form." *McGhee*, 2012 IL App (1st) 093404, ¶ 25. We find this reasoning impossible to square with the purpose of jury polling, which, as we said, protects a juror's "right to inform the court that a mistake has been made, or to ask that the jury be permitted to reconsider its verdict, or to express disagreement with the verdict returned." *Kellogg*, 77 Ill. 2d at 528. The signatures on the verdict forms do not serve as a stand-in for jury polling because polling gives jurors the chance to expressly disavow the signature they affixed to the form.

¶33 We also must address *People v. Sharp*, 2015 IL App (1st) 130438, which came after and relied on *McGhee*. *Id.* ¶¶ 112-113. We find *Sharp* unhelpful for several reasons. First, it appears the only issue the defendant's counsel raised regarding jury polling was trial counsel's ineffectiveness for failing to object to an incomplete poll. *Id.* ¶ 111. Nothing indicates that appellate counsel affirmatively argued that the failure to carry out a complete jury poll amounted to plain error. Second, and relatedly, it appears our discussion of plain error in the context of jury polling was no more than a device to show the lack of prejudice from counsel's failure to object. *Id.* ¶ 113 ("Given that *** Sharp did not satisfy his burden under either prong of the plain error doctrine, Sharp's trial counsel cannot be faulted for failing to object to the court's polling of the jury."). Third, in *Sharp* (unlike here) appellate counsel did not argue that *McGhee* was wrongly decided. By contrast, counsel here directly attacked the validity of *McGhee* in briefing and oral argument. Finally, to the extent *Sharp* can fairly be read as endorsing *McGhee*, we reject *Sharp* for the reasons explained.

¶34 The State also argues we should not rely on *Kellogg* because the trial court's error was factually distinct from the trial court's error here. In *Kellogg*, the trial court asked the jurors, " 'Was

12

this then and is this now your verdict?' " *Kellogg*, 77 Ill. 2d at 527. After one juror asked, " 'Can I change my vote?' " the trial court simply repeated its initial question twice more without probing the juror's answer further; the juror then answered, " 'Yes, Sir.' " *Id.* at 527, 529-530. The court found the trial court had failed to determine whether the juror wanted to change her verdict or wanted to affirm her verdict. *Id.* As the State observes, and the dissent emphasizes, the failure to ask proper follow-up questions of one juror in *Kellogg* contrasts with the failure to ask the probing question of one juror here. But the result—the trial court's inability to determine whether the one juror "desired to abide by the verdict [the juror] had signed" (*id.* at 530)—is identical. If anything, the error before us appears worse—the trial court had no chance to find out, let alone attempt to remedy, any possible equivocation from the unpolled juror.

¶35    The factual differences between the error in *Kellogg* and the error here are a smokescreen. *Kellogg*'s true import involves its discussion about the nature of a defendant's right to a complete jury poll. The language we have discussed describing the importance of the right to a jury poll to the entry of the verdict shows that our supreme court considers a complete and proper jury poll as essential to a fair criminal trial.

¶36    For similar reasons, we reject the argument, alluded to in *McGhee* and endorsed by the dissent, that Jackson must prove prejudice. That line of reasoning conflicts with second-prong review, where we *presume* prejudice " 'because of the importance of the right involved.' " *Sebby*, 2017 IL 119445, ¶ 50 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Stated another way, for second-prong error, the commission of the error is *itself* the prejudice because the right involved is so important. Our supreme court's discussion of the right to jury polling in *Kellogg* and other cases convinces us it is an important right.

13

¶37　Requiring evidence of lack of juror unanimity dodges the question Jackson puts to us: What *kind* of error is failing to completely poll the jury? (Remember that no one disagrees that the trial court failing to poll all 12 jurors was error). As we said, we only require proof of prejudice for first-prong plain error by asking whether the evidence was closely balanced such that the error alone threatens to tip the scales against the defendant. For second-prong errors, the error is the prejudice. The dissent's requirement that Jackson show proof of prejudice from the trial court's incomplete poll presupposes that failing to completely poll the jury does not constitute second-prong plain error.

¶38　Looking at examples from the United States Supreme Court's list of structural errors illustrates the point. Think of courtroom closure. When the trial court improperly excludes spectators to all or portions of a trial, it will be " 'difficult, if not impossible, to require a defendant to prove, or the State to disprove, prejudice.' " *People v. Schoonover*, 2019 IL App (4th) 160882, ¶ 39 (quoting *People v. Revelo*, 286 Ill. App. 3d 286 Ill. App. 3d 258, 267 (1996)). This difficulty makes sense because, at least theoretically, a defendant could have a perfectly procedurally fair trial conducted in secret. But we value the right to a public trial so much that any deprivation warrants reversal. See *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1907-08 (2017).

¶39　The only question in the courtroom closure context is whether the trial court excluded spectators from the courtroom during a relevant portion of the proceedings. See, *e.g.*, *People v. Radford*, 2020 IL 123975, ¶ 24. Here all agree that clear or obvious error occurred. For the reasons we have already explained, our supreme court's discussion of the right to a jury poll shows it is a right central enough to the proper functioning of our criminal justice system that the error alone is prejudicial.

14

¶40    The dissent's citations of *Herron*, 215 Ill. 2d 167, and *People v. Hopp*, 209 Ill. 2d 1 (2004), (*infra* ¶ 55) are not to the contrary. In *Hopp*, the court dealt with specific exceptions to waiver of jury instructional error found in Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013). *Hopp*, 209 Ill. 2d at 7-8. Case law had interpreted that rule to require a " 'severe[ ]' " threat to the fairness of the trial. *Id.* at 8. We deal with the plain error rule rising out of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). We acknowledge our supreme court has enunciated that Rules 451(c) and 615(a) be interpreted "identically" (see *People v. Durr*, 215 Ill. 2d 283, 296 (2005)), but the context of that pronouncement matters. The *Durr* court said the two rules arise in distinct factual situations. See *id.* at 296-97 (defendant who fails to object to instructional error at trial but includes error in posttrial motion "subject to" *Hopp* and Rule 451(c), whereas plain error under Rule 615(a) applies when defendant objects at trial but leaves instructional error out of posttrial motion (discussing *People v. Keene*, 169 Ill. 2d 1, 32 (1995))). *Keene* shows that applying Rule 615(a) to instructional errors secures a safety valve for errors not covered by Rule 415(c). *Keene*, 169 Ill. 2d at 32. The court did no more than confirm that instructional errors can implicate Rule 615(a)'s concerns for fundamental fairness even if the defendant did not meet the strictures of Rule 415(c). *Id.* at 31-32.

¶41    But quibbling over the interpretive differences under Rules 451(c) and 615(a) is, of course, a distraction. The dissent still cites no second-prong plain error case in which a court has required the complained-of error to be "severe" (see *Hopp*, 209 Ill. 2d at 8), to challenge the integrity of the judicial process. Even *People v. Allen*, 222 Ill. 2d 340, 353 (2006), does not use the word "severe," merely restating the test for second-prong plain error. Moreover, our supreme court has clarified that the seriousness of the error refers to the error as a category, not in terms of the degree of prejudice a defendant experiences. The court recently reaffirmed, in the context of a different second-prong error, that " 'an error may involve a[n] *** unimportant matter, but still affect the

15

integrity of the judicial process and the fairness of the proceeding.' " *People v. Birge*, 2021 IL 125644, ¶ 53 (quoting *People v. Lewis*, 234 Ill. 2d 32, 48 (2009). The court in *Lewis* elaborated: "[W]e do not believe a *de minimis* exception can be placed on plain error review. The exception would be difficult to implement because it would require declaring when a dispute become significant rather than *de minimis*. The question would necessarily arise as to where the line should be drawn." *Lewis* 234 Ill. 2d at 48.

¶42 The dissent seemingly draws that line by insisting we deal with "the inadvertent failure to poll 1 of the 12 jurors." *Infra* ¶ 63. But the jury poll supplies the only method the trial court can use to confirm that the signatures on the verdict form reflect the true verdict. Inadvertent or not, for the reasons we have explained, the error affects the integrity of the judicial process. See *Lewis*, 234 Ill. 2d at 48 ("a *de minimis* exception is inconsistent with the fundamental fairness concerns of the plain-error doctrine," which "focuses on the fairness of the proceeding and the integrity of the judicial process").

¶43 As to *Herron*, it only reaffirms the principle that for second-prong plain errors "[p]rejudice to the defendant is *presumed* because of the importance of the right involved." (Emphasis added.) *Herron*, 215 Ill. 2d at 187. As we have repeatedly said, our supreme court's characterization of the right to a jury poll rules out the requirement of a specific showing of prejudice.

¶44 As further support for our conclusion, the United States Supreme Court recently reached the emphatic conclusion that the sixth amendment, incorporated against the states through the fourteenth amendment, requires "[a] jury [to] reach a unanimous verdict in order to convict." *Ramos v. Louisiana*, 590 U.S. ___, ___, 140 S. Ct. 1390, 1395 (2020). Although we do not deal with a constitutional claim here, the context in which *Ramos* arose reveals the importance of each juror's verdict.

16

¶45 *Ramos* involves the propriety of nonunanimous juries to convict criminal defendants in Louisiana and Oregon. *Id.* at ___, 140 S. Ct. at 1394. Louisiana allowed convictions to stand where 10 of 12 jurors believed the defendant was guilty. *Id.* at ___, 140 S. Ct. at 1394. The Court found 10-to-2 verdicts odious to the constitutional guarantee of a right to an impartial jury. *Id.* at ___, 140 S. Ct. at 1401. While no one disagrees that Jackson had a right to a unanimous jury, *Ramos* also stands for the proposition that this right is so central to our justice system it cannot be sacrificed on the altars of expediency or assumption. See *id.* at ___, 140 S. Ct. at 1401 (rejecting "breezy cost-benefit analysis" of unanimous versus nonunanimous juries espoused by plurality in *Apodaca v. Oregon*, 406 U.S. 404 (1972) (plurality opinion)).

¶46 Indeed, *Ramos* invalidates the State's suggestion that we can excuse the court's failure in the poll because the court missed just one juror. *Ramos* leaves beyond peradventure that unanimous means *unanimous*. As we have explained, the only way to ensure that all 12 jurors adhere to the signatures they affixed to the jury forms is to ask each one whether he or she remains resolute in the verdict.

¶47 We find the failure to poll every juror at Jackson's request challenges the integrity of the judicial process. See *Clark*, 2016 IL 118845, ¶ 42. Twelve signatures on all the verdict forms without a complete poll of the jury means we will never know whether the form truly reflects the will of all the jurors. The right to jury polling has been "rooted deep in our common law." *McGhee*, 2012 IL App (1st) 093404, ¶ 15. An incomplete poll prevents the trial court from accepting and recording the verdict. *Id.* (discussing *Rehberger*, 73 Ill. App. 3d at 968). Considering the nature of the right and of the error in Jackson's jury poll, he established a second-prong plain error, which requires we reverse and remand for a new trial.

¶48    Counsel better serve their clients and help preserve judicial resources by objecting to errors in jury polling at the earliest opportunity. *Infra* ¶ 63 n.2. But that does not excuse our correcting a breakdown in the only mechanism available to ensure jurors remain steadfast in their written verdict.

¶49    Reversed and remanded.

¶50    JUSTICE COGHLAN, dissenting:

¶51    Although Jackson has offered no evidence that the guilty verdicts were not unanimous, the majority has chosen to ignore established precedent by reversing his murder and attempted armed robbery convictions[1], granting him a new trial based solely on the trial court's inadvertent failure to poll 1 of the 12 jurors as to her verdicts. Because I see no legitimate reason to depart from this court's considered opinions in *McGhee*, 2012 IL App (1st) 093404, and *Sharp*, 2015 IL App (1st) 130438, (the latter of which was authored by the author of the majority in this case) I dissent.

¶52    Initially, as the majority concedes, Jackson forfeited review of this issue by failing to object and failing to raise the issue in his posttrial motion. Honoring Jackson's forfeiture is particularly apt in this case because his lack of a timely objection deprived the trial court of the opportunity to poll the juror that it overlooked. As we have previously stated:

> "[D]efense counsel should not be permitted to obtain a reversal of the defendant's conviction simply by failing to object and by design depriving the trial court of the opportunity to prevent or correct the error. [Citation.] Here, the trial court may have been able to cure the alleged error had defendant raised an objection at trial or presented the issue in a posttrial motion." *People v. Jackson*, 357 Ill. App. 3d 313, 328 (2005).

---

[1]The jury also found defendant guilty of personally discharging a firearm that proximately caused the death of another person.

See also *People v. Galloway*, 74 Ill. App. 3d 624, 627 (1979) (although trial court polled only 10 out of 12 jurors, defendant forfeited the issue by failing to object and raise the issue in his posttrial motion; "[a]ny oversight could have been corrected immediately if defense counsel had made an objection at the time"); *People v. Black*, 84 Ill. App. 3d 1050, 1055 (1980) ("No objection was raised at the time that the jury had been improperly polled. If it had, any oversight in the question used for the purpose of polling could have been corrected immediately."); *cf. People v. Radford*, 2020 IL 123975, ¶ 37 (expressing concern in the courtroom closure context that " 'defense counsel could secure a reversal simply by intentionally failing to object and, by design, depriving the trial court of the opportunity to prevent or correct the error' " (quoting *People v. Hampton*, 149 Ill. 2d 71, 100 (1992))).

¶53    Nor do I find that the trial court's error rises to the level of second-prong plain error. In this regard, as discussed, I find *McGhee* and *Sharp* persuasive. The defense in *McGhee* requested that the jury be polled, but the trial court erroneously failed to poll any of the jurors—a significantly more egregious omission than in the present case. *McGhee*, 2012 IL App (1st) 093404, ¶ 17. The *McGhee* court found that, although a criminal defendant has a fundamental right to a unanimous jury verdict, polling the jury is "merely a procedural device that helps to ensure that the jury's verdict is unanimous" and not itself a fundamental right. *Id.* ¶¶ 24-25. It further stated:

"Although some evidence that the verdict was not unanimous could potentially satisfy the second prong of the plain-error doctrine, defendant in this case has not offered us any evidence that the verdict was not unanimous other than the trial court's failure to poll the jury. The record is bare of any indication to the contrary, and in fact not one but three separate guilty verdict forms, one for each count, were signed by all 12 jurors." *Id.* ¶ 26.

Thus, under those facts, *McGhee* held that the mere failure to poll the jury did not constitute second-prong plain error. *Id.*

¶54    The majority argues that *McGhee* was wrongly decided because the court "operated under a misconception about second-prong plain error," namely that second-prong plain error was limited to the six categories of structural error articulated by the United States Supreme Court. According to the majority, "[t]he supreme court's express clarification of the nature of second-prong plain error in *Clark* extensively undercuts *McGhee*'s precedential value."

¶55    On the contrary, long before its decision in *Clark*, our supreme court expressly clarified that "[w]e may determine an error is structural as a matter of state law regardless of whether it is deemed structural under federal law." *People v. Averett*, 237 Ill. 2d 1, 13 (2010) (citing *Glasper*, 234 Ill. 2d at 199-200). Thus, our supreme court has never restricted structural error to the six categories alone; rather, the court has consistently considered the impact of the claimed error on the fundamental fairness of the trial. See, *e.g.*, *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009) (violation of one-act, one-crime rule was second-prong plain error); *People v. Walker*, 232 Ill. 2d 113, 131 (2009) (failure to grant continuance to defense counsel was second-prong plain error); *Thompson*, 238 Ill. 2d at 614-15 (Rule 431(b) violation was not second-prong plain error because it did "not implicate a fundamental right or constitutional protection"). *Clark* did not expand the reach of second-prong plain error but merely reaffirmed the long-standing principle expressed in *Thompson*, *Glasper*, and many other cases that the second prong encompasses systemic errors affecting the fundamental fairness of the trial. *Clark*, 2016 IL 118845, ¶ 46 (citing *Thompson*).

¶56    In keeping with this well-established precedent, although *McGhee* correctly acknowledged that structural errors "include" the six categories (*McGhee*, 2012 IL App (1st) 093404, ¶ 22), it did not end its analysis there. Rather, it engaged in extensive discussion of whether "failure to [poll

20

the jury] affects the fairness of a defendant's trial and challenges the integrity of the judicial process" while recognizing that, "[a]lthough some evidence that the verdict was not unanimous could potentially satisfy the second prong of the plain-error doctrine, defendant in this case has not offered us any evidence that the verdict was not unanimous other than the trial court's failure to poll the jury." *Id.* ¶¶ 20-26. Contrary to the majority opinion, the McGhee court did not act under any "misconception about second-prong plain error" in concluding that some evidence that the verdict was not unanimous "other than the trial court's failure to poll the jury" was necessary to justify reversal under second-prong plain error.

¶57    Moreover, we reached the same conclusion in *Sharp*, 2015 IL App (1st) 130438, in which all 12 jurors signed the verdict forms but the trial court only polled 10 of them, and defense counsel raised no objection. We found no second-prong plain error, explaining that "the error *** does not affect the fairness of a defendant's trial or challenge the integrity of the judicial process." *Id.* ¶ 112. We observed that none of the jurors objected when the verdict was announced. In particular, the two jurors who were not polled were present yet did not raise any objection. Thus, we concluded that "[t]he record shows a unanimous verdict." *Id.*

¶58    Inexplicably, the author of the majority opinion in *Sharp* has done an abrupt 180-degree turn to reach the opposite result here, despite the cases being nearly identical on their facts. I see no reason to deviate from our well-reasoned decisions in *Sharp* and *McGhee*. As in those cases, Jackson has not offered any evidence that the verdicts were not unanimous. Prior to the jury beginning deliberations, the judge repeatedly instructed the jurors that their verdicts must be unanimous. The written instructions provided to the jurors also reflected that their verdicts must be unanimous. The record establishes that the jury never communicated that it was deadlocked or having any difficulty reaching unanimous verdicts. During deliberations, the jury sent out three

21

notes to the judge. First, the jury asked for the definition of reasonable doubt. Second, the jury asked whether a certain exhibit showed Jackson or his codefendant Thornton. Third, the jury asked: "Hi, Judge. Can some of us use the other jury room to take a quick break, stretch our legs, and get a minute away?" The court assented but admonished them not to discuss the case until they were all together again. The court also ordered pizza for the jury's dinner. None of these notes indicate that the jurors were having difficulty reaching a verdict. Furthermore, all jurors were present during the jury polling (which was conducted after the trial judge, not defense counsel, asked the parties whether they wished to have the jury polled), none of them voiced any objection to the verdict, and the three verdict forms were signed by all 12 jurors. Under these facts, the trial court's failure to poll the twelfth juror did not affect the integrity of the proceedings or rise to the level of second-prong plain error.

¶59 Establishing second-prong plain error requires more than simply showing an error occurred at trial. As the author of the majority opinion in this case recognized in *In re R.H.*, 2017 IL App (1st) 171332, ¶ 38, "[j]ust because an error implicates the constitution does not turn it into a 'serious' error."

¶60 In *People v. Herron*, 215 Ill. 2d 167, 187 (2005), our supreme court has explained as follows:

"[T]he defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.[Citation.] Prejudice to the defendant is presumed because of the importance of the right involved, *regardless* of the strength of the evidence. [Citation.] *** [T]he the burden of persuasion remains with the defendant." (Emphasis in original and internal quotation marks omitted.)

22

See also *Hopp*, 209 Ill. 2d at 12 (the plain-error rule requires the defendant to "show that the error caused a *severe* threat to the fairness" of the trial (emphasis in original)). Thus, before prejudice can be presumed, Jackson bears the burden of persuasion of demonstrating the error "was so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. In the absence of any evidence suggesting a lack of unanimity among the jurors, Jackson has failed to meet his burden in this case.

¶61    In an attempt to distinguish *Hopp*, the majority asserts that *Hopp* "dealt with specific exceptions to waiver of jury instructional error found in Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013)." *Supra* ¶ 40. The majority therefore claims *Hopp*'s analysis is inapposite to the present case involving plain error under Rule 615(a). In view of *People v. Durr*, 215 Ill. 2d 285, 296 (2005), in which our supreme court specifically noted that "the plain-error analyses under Supreme Court Rules 451(c) and 615(a) are construed identically," this is a distinction without a difference. As to the majority's concern that "[t]he dissent still cites no second-prong plain error case in which a court has required the complained of error to be 'severe' *** to challenge the integrity of the judicial process" (*supra* ¶ 41), in *People v. Allen*, 222 Ill. 2d 340, 353 (2006), our supreme court rejected a second-prong plain error claim on such grounds, stating:

> "[W]hile defendant herein has proven a due process violation which amounted to error by showing that he was required to wear an electronic stun belt at trial without the court having first determined that it was necessary, defendant has failed to persuade this court 'that the error was so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process.' " *Id.* (quoting *Herron*, 215 Ill. 2d at 187).

¶62    *Kellogg*, 77 Ill. 2d 524, upon which the majority relies, is readily distinguishable from this case. In *Kellogg*, during the jury poll, a juror asked the court, " 'Can I change my vote?' " *Id.* at

23

527. The judge did not answer her question but said: " 'The question is, was this then and is this now your verdict?' " *Id.* When the juror did not respond, the judge repeated, " 'Was this then and is this now your verdict?' " *Id.* Finally the juror answered, " 'Yes, Sir.' " *Id.* The *Kellogg* court found this colloquy provided evidence that the verdict may not have been unanimous, since the juror explicitly asked if she could change her vote, and her final response might have been influenced or coerced by the trial court's "great influence over the jury" (*id.* at 529). By contrast, as discussed, there is no evidence indicating any lack of unanimity in the present case. More importantly, the *Kellogg* court did not consider the issue of plain error since "the failure to object has not been raised by the State in this court" (*id.* at 531).[2] In contrast, the State vigorously argues forfeiture in the present case.

¶63    As our supreme court has repeatedly recognized, "[a] fair trial *** is different from a perfect trial. [Citation.] It is the fairness of the trial, not the perfection of the trial, that the two prongs of plain error aim to protect." (Internal quotation marks omitted.) *People v. Ely*, 2018 IL App (4th) 150906, ¶ 19. The plain-error doctrine

> "is not a general saving clause preserving for review all errors affecting substantial
>
> rights whether or not they have been brought to the attention of the trial court.
>
> [Citation.] Rather, it is a narrow and limited exception to the general waiver rule
>
> [citation], whose purpose is to protect the rights of the defendant and the integrity
>
> and reputation of the judicial process." (Internal quotation marks omitted.) *Herron*,
>
> 215 Ill. 2d at 177.

---

[2]The court further noted that "[c]ounsel's failure to make a timely objection has necessitated a review by the appellate court, a review by this court, and a new trial in the trial court, all of which might have been avoided. We view this as a needless waste of judicial time." *Id.* at 530-31.

Under the factual circumstances of this case, where there is no evidence that the jury verdicts were not unanimous, the inadvertent failure to poll 1 of the 12 jurors did not prejudice Jackson's right to a unanimous jury.

¶64    For this reason, the majority's citation of *Ramos*, 590 U.S. at ___, 140 S. Ct. at 1395 (2020), for the proposition that a defendant is constitutionally entitled to a unanimous jury verdict, is inapposite. To be clear, there is no dispute that a jury verdict must be unanimous. That is exactly what Jackson received in this case. The record is devoid of even the suggestion of a lack of unanimity among the 12 jurors who signed three sets of verdict forms finding Jackson guilty of first degree murder and attempted armed robbery. Jackson's right to unanimous jury verdicts has not been violated.

¶65    Accordingly, I respectfully dissent.

**No. 1-18-0672**

| | |
|---|---|
| **Cite as:** | *People v. Jackson*, 2021 IL App (1st) 180672 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-00994(01); the Hon. Paula M. Daleo, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deborah K. Pugh, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Noah C. Montague, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |