2022 IL App (2d) 200349-U
No. 2-20-0349
Order filed May 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-852 |
| JAVANTAVIOUS Z. BENFORD, | ) ) ) | Honorable Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not abuse its discretion in denying defendant's motion for recusal of the Winnebago County State's Attorney's Office. Also, an error in a jury instruction did not constitute plain error. We therefore affirm.

¶ 2    Defendant, Javantavious Z. Benford, appeals from his conviction of first-degree murder, arguing that (1) the trial court abused its discretion in denying his motion seeking to recuse the Winnebago County State's Attorney's Office based on his familial relationship with the State's Attorney; and (2) an error in a jury instruction constituted plain error and requires a new trial. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4     On April 21, 2016, defendant was charged in a 42-count indictment with first-degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2016)), armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), attempted armed robbery (720 ILCS 5/8-4(a), 18-2(a)(2) (West 2016)), possession of a firearm without a firearm owner's identification card (430 ILCS 65/2(a)(1) (West 2016)), unlawful possession of firearms (720 ILCS 5/24-3.1(a)(1), (2) (West 2016)), and mob action (720 ILCS 5/25-1(a)(1) (West 2016)). The charges alleged that on March 29, 2016, defendant shot and killed Akeem Smith, and that defendant and his codefendants, Martaivis Harmon and Retavian Jefferson, committed related crimes.

¶ 5                              A. Motion for Recusal

¶ 6     On March 15, 2019, defendant filed a motion requesting the recusal of the Winnebago County State's Attorney's Office due to defendant's alleged familial relationship with State's Attorney Marilyn Hite-Ross.

¶ 7     At a hearing on March 18, 2019, the assistant State's Attorney stated that "defendant early on sent a letter to Ms. Hite-Ross claiming a familial tie ***." The State subsequently filed a motion to strike defendant's motion for recusal, arguing that it named family members of the State's Attorney and put their safety in danger. The trial court granted the motion, giving leave to defendant to file an amended motion without naming Hite-Ross's family members.

¶ 8     On April 12, 2019, defendant filed a new motion requesting the recusal of the Winnebago County State's Attorney's Office. He alleged as follows. Hite-Ross had married the uncle of defendant's mother, Keyondia Watkins, and Watkins had known Hite-Ross since Watkins was nine years old. Watkins had a "long and warm familial relationship" with Hite-Ross, and defendant had known Hite-Ross his entire life. The Ross family had regularly provided Watkins financial

aid, including helping her purchase her house in Atlanta, Georgia, and the aid had allowed Watkins to allocate some money to send to defendant during his incarceration. The codefendants had either accepted or were offered a plea to second-degree murder in the case, but no such offer was extended to defendant. Defendant argued that considering the differences in the plea offers to defendant and his codefendants, and the familial and financial ties between defendant's mother and the family of the State's Attorney, there was the appearance of a conflict of interest.

¶ 9    The State filed a reply stating that it was understandable that defendant was not given the same offer as his codefendants because the State's theory of the case was that defendant fatally shot the victim. The State denied that there was a long and warm familial relationship between Watkins and Hite-Ross and stated that there was no ongoing financial relationship between them.

¶ 10    In his response, defendant alleged that he had initially received an offer that was similar to those conveyed to his codefendants, but the assistant State's Attorney then stated that she was mistaken in the offer and that her supervisors had told her that defendant would not be extended the same offer as his codefendants. He further alleged that the State's Attorney's Office had recused itself in the case of Janell Ross, who had an "identical" familial relationship with Hite-Ross. Defendant attached an affidavit from Watkins in which she described her relationship with Hite-Ross. She stated that she had spent nights at the house of Hite-Ross and her uncle when she was young; that Hite-Ross "was there to help with" her dad's funeral; that they went "out [of their] way for Christmas for [her] kids when they" could; and that Hite-Ross had helped her with housing when she was "low on funds."

¶ 11    A hearing on the motion took place on May 30, 2019. Peggy Simmons, defendant's maternal grandmother, provided the following testimony. Hite-Ross married the brother of Watkins' father. Simmons had known Hite-Ross for about 25 years but had seen her in person only

a couple of times over that period. Defendant had "[n]ot too much" contact with the Ross family but would "[o]ften" visit the Ross family. Defendant had met Hite-Ross and knew that she was his aunt. Hite-Ross came to the house three to four years prior and brought Christmas gifts for the kids, including defendant. When asked when defendant had contact with Hite-Ross, Simmons replied that "it was about during that time when she brought gifts over." Simmons knew that Watkins had received money from the Ross family because Hite-Ross's husband had called Simmons to verify that Watkins needed it for certain things.

¶ 12     Audrey Ross testified as follows. Defendant was her brother's grandson. Hite-Ross married another brother of Audrey's in 1987. Hite-Ross had known defendant since that time and had seen him at family gatherings and funerals, which occurred "every now and then." The family gatherings had 50 to 100 people. Hite-Ross's husband, "DR," gave the eulogy at the funeral of defendant's grandfather. She was not aware if Watkins had a financial relationship with DR. Audrey was the mother of Janell Ross. The State stipulated that the Attorney General's office handled Janell's prosecution.

¶ 13     Colleen Young testified that defendant's grandfather was her nephew. DR had seen defendant at family gatherings.

¶ 14     Defense counsel argued that the State's Attorney's Office should recuse itself because it had done so in Janell's case, and he had the same relationship to Hite-Ross as defendant, being the grandson of Hite-Ross's brother-in-law.[1] He argued that Watkins had a long relationship with Hite Ross and that Hite-Ross's husband had provided Watkins with financial support. Counsel argued

---

[1] The testimony actually indicated that Janell was Hite-Ross's nephew and that defendant was Hite-Ross's great nephew.

that defendant was prejudiced because there was an appearance of impropriety and because defendant had received a similar offer as his codefendants but it was rescinded. Counsel argued that there was a strong possibility that the State might treat defendant harsher than his codefendants.

¶ 15    The trial court denied the motion for recusal on June 6, 2019; we summarize its findings. Watkins' affidavit did not provide the timing of the financial assistance or any further details, nor did it state how long she had lived in Atlanta and the extent of any contacts with Hite-Ross and her husband in recent years. Defendant was not similarly situated to his codefendants because the State's theory of the case was that defendant fired the fatal shot, and the State had an evidentiary reason to treat defendant differently given the victim's dying declaration identifying defendant as the person who shot him. Defendant had not suffered any actual and substantial prejudice from his and his family's relationship with Hite-Ross. The decision to have the Attorney General's Office prosecute Janell was an exercise of prosecutorial discretion. Defendant showed a relationship between his mother and Hite-Ross through Hite-Ross's husband's family, based primarily on attending family functions, but this fell below the "significant emotional ties" standard, and he failed to establish that the alleged interest caused actual and substantial prejudice. As such, defendant failed to meet his initial burden of showing that there was an actual conflict of interest.

¶ 16                                B. Trial

¶ 17    Testimony in defendant's trial began on October 22, 2019. We summarize the evidence presented by the State. At about 2:35 p.m. on March 29, 2016, Detective Brian Strawser of the Rockford Police Department was dispatched to a call of "shots fired" at the address of 3231 Parkside Avenue. Several individuals had been seen running from the garage area of the residence. He and Officers Wagner and Schuster entered the side door of the garage, which was slightly ajar.

Officer Wagner had a body camera on. Inside, there were numerous spent shell casings throughout the garage, and Smith was laying on the ground with a gunshot wound to his chest or lower abdomen.

¶ 18 The body cam video was played for the jury, and the jury received a transcript of the recording. Detective Strawser had the following exchange with Smith, according to the transcript:

"OFFICER STRAWSER: You're going to die, man. Who shot you:

* * *

[SMITH]: Tavious.

OFFICER STRAWSER: Tavious?

[SMITH]: Yes.

* * *

OFFICER STRAWSER: You said Tavious shot you, right?

[SMITH]: Benford.

OFFICER STRAWSER: Tavious Benford?

[SMITH]: Yes.

* * *

911 OPERATOR: Tavious Benford is going to be a suspect.

OFFICER STRAWSER: Tavious Benford?

[SMITH]: Yes.

OFFICER STRAWSER: Got it.

* * *

OFFICER STRAWSER: What happened?

[SMITH]: *They* shot me.

* * *

> OFFICER STRAWSER: You were here at the house?
>
> [SMITH]: Yes.
>
> OFFICER STRAWSER: Okay. What happened?
>
> [SMITH]: *They* shot me." (Emphases added.) [2]

Smith further stated that he was there because he "was supposed to bought [*sic*] some weed."

¶ 19     Smith was transported to the hospital and died at about 8:30 p.m. An autopsy showed four gunshot entrance wounds and corresponding exit wounds. One gunshot wound went from the left side of Smith's abdomen and exited from the right upper thigh. That wound was a "contact wound," meaning that the muzzle of the firearm was ½ inch or less from the skin. The forensic pathologist opined that Smith died from that particular gunshot wound, and that his other injuries did not contribute to his death.

¶ 20     Quincy Wright, Smith's cousin, testified at trial that he did not recall any of the events of March 29, 2016, but acknowledged giving a written statement to the police. In the statement, Wright said that on March 29, 2016, Smith called him and asked for a ride because he was going to buy a .38-caliber revolver from defendant for $150. Wright picked Smith up, and Smith "was using the Facebook Messenger App to communicate with [defendant]." Wright drove Smith to Parkside Avenue and saw defendant and Jefferson outside. He also noticed that Smith had a revolver in the pocket of his sweatshirt. Smith exited the car and went around the corner of the

---

[2] Detective Strawser testified that he could not tell if Smith said "they shot me" or "he shot me" in response to the questions. It is unclear from viewing the video whether Smith said "they" or "he."

house with defendant and Jefferson. Wright heard a lot of gunshots "what seemed like right after" Smith had walked out of his view. Wright drove through the alley behind the house and saw defendant standing near the patio door of the house and Jefferson and Harmon walking towards him. Harmon was holding a rifle and started shooting at Wright. Wright drove away and called Smith, who asked Wright to come and get him; Smith said that he was in a garage and had been shot.

¶ 21    The evidence showed that defendant, Harmon, and Jefferson went to the emergency room in defendant's car to obtain treatment for gunshot wounds to Harmon and Jefferson. The right rear passenger window on defendant's car was broken, and there was glass on the inside of the back seat. Defendant told an officer who was dispatched to the hospital that the window was broken because "he had girlfriend problems." Defendant told the officer that he was driving when he was flagged down by two men, Harmon and Jefferson, whom he knew as "Tank." They told him that they had been shot, so he gave them a ride to the hospital. Defendant told the officer that his name was Tavious Benford, and when asked his full name, defendant said that it was Javontavious Benford. A ".380 auto" caliber shell casing was later found in the back of defendant's vehicle.

¶ 22    From the garage, the police recovered 16 shell casings from a Remington brand .22 long rifle and 1 Winchester brand 9-millimeter casing. There was no evidence of a .380-caliber gun, which is usually semiautomatic, being fired in the garage.

¶ 23    A 9-millimeter Smith & Wesson handgun was found in a pile of plywood on the side of an unattached garage about seven blocks from 3231 Parkside Avenue. It contained 19 live rounds of ammunition, including one in the chamber. The 9-millimeter casing found in the garage was determined to have been fired from this gun. It could not be determined whether all of the .22-caliber casings were fired from the same firearm. Two bullet fragments were recovered from

gunshot wounds in Smith's left and right thighs, which wounds were not responsible for his death. One of the fragments was from a .22-caliber bullet, but the other fragment could not be identified. A bullet found on Smith's gurney at the hospital was determined to be a 9-millimeter caliber bullet. A bullet from Jefferson's stomach area was determined to be "consistent with being of a .22 caliber."

¶ 24    During trial, the parties agreed that the trial court should read the jury a modified version of Illinois Pattern Jury Instruction, Criminal, No. 3.11 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.11) in regard to Wright's prior inconsistent written statement that he made to the police. The parties agreed to the trial court reading the following instruction to the jury:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given to the testimony you heard from the witness in this Court Room. Paragraph 2 of the instruction applies to the portions of the [s]tatement that describe things that Quincy Wright is alleged to have personally observed, in other words, for this purpose you may not consider Mr. Wright's statements to the extent that it concerns matters that Akeem Smith told Quincy Wright. This is Paragraph 2. However, you may consider a witness's earlier inconsistent statements as evidence without this limitation when the statement narrates, describes or explains an event or a condition the witness had personal knowledge of, and the statement was written or signed by the witness. The last Paragraph applies to both Paragraphs 1 and 2. It is for you to determine whether the witness made the earlier statement and if so what weight should be given to the statement. In determining

the weight to be given to an earlier statement you should consider all the evidence or all the circumstances under which it was made."

¶ 25    After the State rested, Harmon provided the following testimony for the defense. He had a conviction for second degree murder in connection with Smith's death. On March 29, 2016, he was with defendant and Jefferson in the detached garage of the residence where Harmon lived with his grandmother. They were talking and smoking marijuana. Smith called Harmon at about 2:15 p.m. asking to purchase marijuana from him, and Smith came over at about 2:30 p.m. to buy two bags for $20. Smith called Harmon to say he had arrived. Harmon exited the garage and saw Smith get out of a car, and they walked back to the garage together. Jefferson was holding a rifle that was 2½ to 3 feet in length. Smith then tried to rob them using a small silver .32 revolver. Harmon began wrestling with Smith, and Smith shot Harmon in the upper right chest and lower left thigh. Harmon shot back once in defense, and Jefferson fired three or four shots at Smith. Smith shot his gun six times, and one shot hit Jefferson in the stomach. Defendant did not have a gun, and when the shooting started, defendant took cover on the side of a freezer. Afterwards, when Smith was laying down on the ground, they took Smith's gun. Smith never displayed any money, and they did not take any money from him. Defendant drove Harmon and Jefferson to the hospital, and they "dropped the guns off" on the way there. The bullets from Harmon's injuries were never removed from his body.

¶ 26    On cross-examination, Harmon testified that he did not recall telling Officer Erik Semenchuk at the hospital that Jefferson and defendant were planning to sell jewelry to an unknown black male, and that the man started shooting at Harmon as soon as the man exited the car. He also did not recall telling Officer Duane Beets at the hospital that when he was in the garage with defendant and Jefferson, defendant said that he called Smith and was going to sell him

jewelry. Harmon did not remember saying that he and defendant greeted Smith outside when Smith arrived, and they went into the garage. He did not recall saying that when he then turned to leave the garage, Smith shot him in the leg for no reason, and then Jefferson shot Smith. Harmon did not recall the detective saying that it was unlikely that one man would try to rob three individuals, or responding that maybe defendant or Jefferson pulled out their guns first.

¶ 27    Harmon met again with Officer Beets on April 11, 2016, and made a recorded statement. Prior to the recording being played for the jury, the trial court read a modified IPI Criminal No. 3.11 instruction that had been agreed to by the parties and was similar to the instruction for Wright's prior inconsistent statement. The trial court stated, in relevant part:

> "For this next part you have to exclude from your brain the parts that Javontavious Benford said, and then you can consider everything that's going to be on this Statement that's being played, other than the statements that are alleged to have been made by Mr. Benford."

The trial court repeated a similar instruction when reading the jury instructions after closing arguments.

¶ 28    We summarize Harmon's statements from the recording. Defendant and Jefferson picked Harmon up on the day in question, and they went to Harmon's grandmother's garage. Defendant said that he was talking to Smith on Facebook and that Smith was going to come over. Smith was dropped off at the front of the house, and Harmon and defendant escorted him to the garage. They smoked marijuana, with Smith staying near the side door to the garage. Harmon thought that Smith was planning to buy some jewelry. When they were done smoking, Harmon walked toward the side door to leave and go shower. Defendant and Jefferson were behind Harmon such that Harmon could not see them. Harmon guessed that Smith saw either Jefferson or defendant do something

with their guns, and Jefferson may have "went off" on Smith. Smith may have then thought that Harmon was going to grab Smith and that the group was going to rob him. Smith then shot Harmon through his sweatshirt pocket with a gun that he had there, hitting Harmon in the leg. Harmon fell, and Jefferson and defendant then shot Smith. Smith fell and fired shots from the ground, hitting Harmon a second time and also hitting Jefferson. Jefferson had a rifle, and defendant had a 9-millimeter gun. He, Jefferson, and defendant then got into defendant's car to go to the hospital. Harmon saw the car that Smith had arrived in pull up in the alley and then leave.

¶ 29    The trial concluded on October 28, 2019. During deliberations, at 2:21 p.m., the jury asked, among other things, "Can we use Harmon's first statement as evidence?" It then clarified that it meant Harmon's video interview. The trial court told the jury that it would be allowed to return to the courtroom to view Harmon's recorded interview with Officer Beets. The State noticed an error with the written jury instruction on Harmon's prior inconsistent statement, in that the instruction said that evidence of a prior inconsistent statement came in substantively if written and signed. Here, in contrast, there was a recording. The parties amended the instruction, and the trial court informed the jury at 3:36 p.m. that there was an error. When the jury came back to the courtroom to watch the recorded interview, the trial court read a revised instruction, and a new version of the instruction was sent back with the jury.

¶ 30    At 5:33 p.m., the jury asked if it could "get additional guidance on what 'legally responsible' for the conduct of others" meant. The trial court responded that it could not provide additional guidance beyond the instructions already given.

¶ 31    At about 10 p.m., the jury found defendant guilty of first-degree murder (strong probability of death or great bodily harm), first-degree murder (forcible felony of mob action), and mob action. It found defendant not guilty of armed robbery and attempted armed robbery. Finally, the jury

found that the State had not proven that defendant was armed with a firearm or personally discharged a firearm.

¶ 32    On December 11, 2019, defendant filed a second amended motion for a new trial/ judgment notwithstanding the verdict. The trial court denied the motion on January 27, 2020.

¶ 33    At sentencing, the parties agreed that defendant's convictions of mob action and felony murder based on mob action merged into his first-degree murder conviction. The trial court sentenced defendant to 25 years' imprisonment.

¶ 34    Defendant filed a motion to reconsider his sentence on April 2, 2020. The trial court denied the motion on June 10, 2020, and defendant filed a timely appeal.

¶ 35                                II. ANALYSIS

¶ 36                            A. Motion for Recusal

¶ 37    Defendant first argues that the trial court abused its discretion in denying his motion for the recusal of the Winnebago County State's Attorney's Office.

¶ 38    The Illinois Constitution provides for the election of a State's Attorney in each county. Ill. Const. 1970, art. VI, § 19. Section 3-9005(a)(1) of the Counties Code (55 ILCS 5/3-9005(a)(1) (West 2018)) states that the State's Attorney has the duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned." Section 3-9008(a-10) of the Counties Code provides:

>   "The court on its own motion, or an interested person in a cause or proceeding, civil
> or criminal, may file a petition alleging that the State's Attorney has an actual conflict of
> interest in the cause or proceeding. The court shall consider the petition, any documents
> filed in response, and if necessary, grant a hearing to determine whether the State's

Attorney has an actual conflict of interest in the cause or proceeding. If the court finds that the petitioner has proven by sufficient facts and evidence that the State's Attorney has an actual conflict of interest in a specific case, the court may appoint some competent attorney to prosecute or defend the cause or proceeding." 55 ILCS 5/3-9008(a-10) (West 2018).

The purpose of the special prosecutor provision is to prevent the discharge of the State's Attorney's duties from being influenced by personal interest. *People v. Max*, 2012 IL App (3d) 110385, ¶ 61.

¶ 39     A State's Attorney has "an actual conflict of interest" if he or she "is interested in" the case as either (1) a private individual, or (2) an actual party to the action. *In re Appointment of a Special State's Attorney on Behalf of Hanley*, 2020 IL App (2d) 190845, ¶ 17. Additionally, a State's Attorney may be considered "interested" if (3) the attorney's involvement creates the appearance of impropriety in prosecuting a particular defendant. *People v. VanderArk*, 2015 IL App (2d) 130790, ¶ 38; *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 46l; *People v. Lang*, 346 Ill. App. 3d 677, 682 (2004). But *cf. In re Appointment of Special Prosecutor*, 2019 IL App (1st) 173173, ¶ 39 (appearance of impropriety is not a basis for the appointment of a special prosecutor). Defendant claims that the first and third categories apply here.

¶ 40     If the alleged interest is personal as a private individual, the defendant must show either that the relationship involves significant emotional ties or that the defendant suffered actual and substantial prejudice. *People v. Arrington*, 297 Ill. App. 3d 1, 3-4 (1998). In situations involving the appearance of impropriety, "even if there is a concern about the appropriateness of the State's Attorney's office prosecuting a case against a particular defendant, that concern must be weighed against countervailing considerations." *VanderArk*, 2015 IL App (2d) 130790, ¶ 38. Those considerations include the burden that would be placed on the State's Attorney's Office if the entire office had to be disqualified; how remote the connection is between the State's Attorney's

Office and the alleged conflict of interest; and the extent of the public's awareness of the alleged conflict of interest. *Id.*

¶ 41    A special prosecutor may be appointed at any stage in the case. *Lang*, 346 Ill. App. 3d at 681. We review a trial court's decision of whether to appoint a special prosecutor for an abuse of discretion. *County of Tazewell ex rel. Hranka v. Zimmerman*, 2021 IL App (3d) 200315, ¶ 18. A trial court abuses its discretion if its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *In re Appointment of a Special State's Attorney on Behalf of Hanley*, 2020 IL App (2d) 190845, ¶ 17.

¶ 42    Defendant argues that the trial court abused its discretion in denying his motion for recusal of the Winnebago County State's Attorney's Office where "sufficient emotional ties existed" and prosecution by his great aunt presented the appearance of impropriety by her office, outweighing any burden that would have occurred to the office.

¶ 43    Defendant cites *Polonowski*. There, the trial court dismissed the charges against the defendant because the State's Attorney was engaged to the niece of the wife of the defendant's expert. *Polonowski*, 258 Ill. App. 3d at 498-99. The trial court ruled that appointing a special prosecutor would not cure the prejudice because the special prosecutor would most likely have to consult with the State's Attorney to begin the case. *Id.* at 500. The supreme court held that the trial court erred in dismissing the charges because the relationship did not create a conflict of interest or actual prejudice. *Id.* at 500-03. The court stated that the relationship between the expert and the State's Attorney was "tenuous at best" as they had only seen each other a few times, their wives did not socialize, and the State's Attorney testified that he did not consider the expert to be a member of his family. *Id.* at 503. The court stated that the "fact that the relationship was familial does not in and of itself create substantial emotional ties, especially given that the familial

relationship was created by marriage." *Id.* The court stated that even if a disqualifying relationship existed, the trial court could have resolved the issue by appointing a special prosecutor and entering an order forbidding contact with the State's Attorney, and that the failure to appoint a special prosecutor as a less drastic alternative to dismissing the charges was an abuse of discretion. *Id.* at 503-04.

¶ 44    Defendant argues that in contrast to *Polonowski*, he presented evidence showing the significant emotional ties required to establish a personal conflict of interest necessitating recusal. He maintains that Watkins' affidavit showed that Hite-Ross and her husband went out of their way to support defendant and his mother. Defendant contends that although Hite-Ross was related by marriage as in *Polonowski*, this case is distinguishable because the affidavit shows that Hite-Ross would have considered defendant part of her family by the fact that she assisted with defendant's grandfather's funeral, "helped with Christmas," and helped with Watkins' finances. Defendant asserts that the details in Watkin's affidavit were corroborated by Simmons' testimony. Defendant argues that his relationship with Hite-Ross was not tenuous, as the witnesses testified that defendant had seen her at family gatherings throughout his life, and her husband spoke at defendant's grandfather's funeral. Defendant points out that after he was charged, he contacted Hite-Ross by a letter in which he noted their family relationship. Defendant further argues that although the court in *Polonowski* concluded that the record did not show "substantial emotional ties," that actual test is whether the relationship involves "significant" emotional ties (see *Arrington*, 297 Ill. App. 3d at 3). Defendant argues that the evidence here met this standard.

¶ 45    Defendant additionally argues that the trial court abused its discretion because defendant's prosecution by his great aunt created the impermissible appearance of impropriety. Defendant cites *Lang*, 346 Ill. App. 3d at 682, where the court stated that the purpose of appointing "a special

prosecutor in such a situation" is to "maintain the public's confidence in the impartiality and integrity of our criminal judicial system," and that "[e]ven in the absence of demonstrated prejudice to the defendant, a special prosecutor may be appointed if necessary to remove an appearance that the defendant is being unfairly prosecuted." See also *People v. Courtney*, 288 Ill. App. 3d 1025, 1032 (1997) (*per se* conflict of interest existed where the defendant's former trial counsel becomes the State's Attorney).

¶ 46    Defendant states that he has not found an Illinois case directly on point but that foreign courts have concluded that a familial relationship between the defendant and a prosecutor requires the recusal of the entire State's Attorney's Office. See *People v. Doyle*, 159 Mich. App. 632, 646 (1987) (affirming trial court's disqualification of the State's Attorney's Office from prosecuting the defendant, where the State's Attorney and the defendant were brothers-in-law); *People v. Nuzzi*, 489 N.Y.S.2d 836, 841 (N.Y. Sup. Ct. 1985) (entire staff of the district attorney was disqualified where one of the assistant district attorneys was the defendant's cousin, because the "appearance of impropriety inherent in the blood relationship at bar requires disqualification"). Defendant notes that here, the State represented that Hite-Ross had "examined" the case and reviewed it with two Assistant State's Attorneys. Defendant argues that as in *Doyle*, this created the appearance of impropriety. Defendant asserts that although the trial court rejected defense counsel's argument that the refusal to extend an offer of second-degree murder was evidence of prejudice and ruled that defendant did not suffer prejudice, a conflict still existed because defendant had the right to be free from any anxiety that his case was being treated differently because of his familial relationship with the State's Attorney.

¶ 47    Defendant maintains that this case also presented the risk of public knowledge about the conflict, as the record shows that there was a request for extended media coverage after defendant's

arrest, and both attorneys were contacted by a reporter at the conclusion of trial. Defendant argues that given that he was being prosecuted by his great aunt, the countervailing considerations do not outweigh "the importance of maintaining the public's esteem for the State's Attorney's office and the integrity of the criminal justice system ***." *Lang*, 346 Ill. App. 3d at 685.

¶ 48 Defendant further argues that the conflict of interest was not outweighed by any countervailing considerations. See *supra* ¶ 40. Defendant asserts that because Hite-Ross is no longer the Winnebago County State's Attorney, the Winnebago County State's Attorney's Office may still prosecute the case on remand for a new trial. Defendant also argues that at the time of his motion, the burden of disqualification was not high. Defendant argues that the parties were not on the verge of trial when he moved for a recusal, and the State had moved for a continuance of the set jury trial date shortly before his motion and waited several more months to file motions *in limine* on critical evidentiary issues such as the admissibility of a 911 call and the presentation of firearms evidence. Defendant argues that the conflict of interest cannot be considered remote because it involved the head of the State's Attorney's Office who, at a minimum, was involved in the case in a supervisory capacity and worked with the assistant State's Attorneys prosecuting the case. Defendant contends that the State's Attorney's Office appeared to recognize similar familial relationships were not remote because the office recused itself from the prosecution of Janell, "who was also a nephew to" Hite-Ross.

¶ 49 The State argues that the incident took place on March 29, 2016, and that Hite-Ross was not appointed as the Winnebago County State's Attorney until November 2018. It argues that it was only after defendant expressed his dissatisfaction with the State's plea offer that he filed a motion requesting the recusal on March 15, 2019, which was nearly three years after he was charged. The State maintains that defendant suffered no prejudice as a result of his familial

relationship with Hite-Ross, as he did not receive the same plea offer as his codefendants because there was compelling evidence that defendant was the individual who fatally shot the victim. The State maintains that the fact that defendant was unsatisfied with his offer did not suddenly create a sound basis for filing a motion for recusal.

¶ 50    The State argues that defendant's "personal connection" to Hite-Ross was remote and tenuous, as she was his great aunt by marriage and they saw each other occasionally at very large family gatherings. It argues that although the parties noted that defendant had contacted Hite-Ross by letter after he was charged, the record lacks information about the letter's contents. The State maintains that under these circumstances, defendant has failed to show that he and Hite-Ross had significant emotional ties.

¶ 51    The State further argues that the tenuous familial connection substantially weakened any appearance of impropriety. The State asserts that there is no evidence in the record that the public was aware of the alleged conflict of interest because although there was occasional local media coverage, the comments made by the trial court and attorneys suggested that the media's interest was limited. The State contends that defendant's situation is distinguishable from Janell's, whose case the State's Attorney's Office did recuse itself from, because Janell was Hite-Ross's nephew whereas defendant was Hite-Ross's great nephew. The State argues that it can reasonably be inferred that the State's Attorney's Office determined that Hite-Ross's familial relationship with Janell was sufficiently close to warrant recusal, whereas the considerably more distant relationship with defendant was remote enough to not warrant recusal.

¶ 52    The State maintains that at the time defendant filed his motion, the State's Attorney's Office had already completed substantial pretrial preparations spanning nearly three years, and the attorneys assigned to the case had already argued numerous pretrial motions and had met with a

number of witnesses. The State argues that disqualifying the whole office at such a late stage in the proceedings would have undoubtedly placed a severe burden on the prosecution of the case, such that countervailing considerations weighed heavily against the alleged appearance of impropriety. The State argues that the trial court properly exercised its discretion in denying defendant's motion for recusal because Hite-Ross's distant familial relationship with defendant did not influence the discharge of the State's Attorney's Office's duties in the instant case, nor did it cause defendant actual prejudice.

¶ 53    Regarding Hite-Ross's alleged conflict of interest due to her interest as a private individual through her familial relationship with defendant, defendant was required to show either significant emotional ties or that he suffered actual and substantial prejudice. *Arrington*, 297 Ill. App. 3d at 3-4. Although defendant argued prejudice in the trial court through not receiving the same plea offer as his codefendants, on appeal he asserts only significant emotional ties. During oral arguments, defendant's appellate counsel argued that the issue of recusal was one of first impression since no bright-line rule exists as to what establishes significant emotional ties. We agree that there is no bright-line rule on this issue. Instead, what constitutes significant emotional ties must be determined on a case-by-case basis. Consequently, based on the circumstances of this case, we hold that the trial court did not abuse its discretion in denying defendant's motion for recusal.

¶ 54    In particular, the evidence showed that Hite-Ross was defendant's great aunt by marriage, as opposed to a blood relation. See *Polonowski*, 258 Ill. App. 3d at 503 ("fact that the relationship was familial does not in and of itself create substantial emotional ties, especially given that the familial relationship was created by marriage"). Defendant's mother discussed her personal relationship with Hite-Ross in her affidavit, but she did not testify at the hearing, and the issue

here is defendant's own relationship with Hite-Ross. Further, it is unclear how much financial assistance came from Hite-Ross as opposed to her husband, as Simmons testified that Hite-Ross's husband had called her to verify that Watkins needed money, and it was also not clear how long before the shooting the financial assistance was rendered. Further, Hite-Ross's husband gave the eulogy at defendant's grandfather's funeral, and not Hite-Ross.

¶ 55    Simmons testified both that defendant had "[n]ot too much" contact with the Ross family but would "[o]ften" visit them. Aside from the contradictory nature of this testimony, the "Ross family" included defendant's own grandfather, with whom defendant may be expected to have substantial contact. Simmons testified that defendant had last seen Hite-Ross three to four years before, when she brought Christmas gifts for the kids, including defendant. Audrey Ross testified that Hite-Ross saw defendant at family gatherings and funerals, which occurred "every now and then" and included 50 to 100 people.

¶ 56    The evidence therefore showed that defendant was related to Hite-Ross but that it was through marriage, and that their interaction largely consisted of seeing each other at occasional, very large family gatherings. Hite-Ross's decision to recuse herself in Janell's case is not at issue here. Regardless, as the State points out, defendant's relationship with Hite-Ross was more distant than Janell's relationship with her, as Janell was her nephew and defendant was her great nephew. Therefore, the trial court's determination that defendant lacked the significant emotional ties necessary to require the appointment of a special prosecutor was not an abuse of discretion. *Cf. Arrington*, 297 Ill. App. 3d at 4 (the defendant's allegations that the State's Attorney's cousins owned the store that the defendant attempted to rob did not show that the State's Attorney's relationship to the store involved such significant emotional ties that his personal interests influenced the discharge of his duties).

¶ 57    The distant familial relationship also weighs against a determination that the prosecution by the State's Attorney's Office created the appearance of impropriety. Notably, the foreign cases that defendant cites involved much closer relations, being a brother-in-law and a cousin. This case is also readily distinguishable from *Lang*, which defendant cites extensively on this issue. There, the appellate court held that a special prosecutor should have been appointed based on the appearance of impropriety in prosecution because the assistant State's Attorney secretly followed the defendant after a proceeding to obtain evidence of a crime, hid behind some potted flowers and a shaded glass window, called the police, was involved in the prosecution of the case, and was the State's sole witness at trial. *Lang*, 346 Ill. App. 3d at 679, 683-84. Here, there was no such evidence that defendant was singled-out, and his differing plea offer was explained by the strong evidence of his much greater culpability in the murder.

¶ 58    To the extent that there could arguably be some concern about Hite-Ross's office prosecuting defendant, the countervailing considerations weighed in favor of the State. The distant relationship meant that the connection between the State's Attorney's Office and the alleged conflict of interest was remote. See *VanderArk*, 2015 IL App (2d) 130790, ¶ 38. Though defendant points to some level of media coverage of his trial, he presented no evidence that the media focused on his connection to Hite-Ross. See *id.* (countervailing considerations include the extent of the public's awareness of the alleged conflict of interest). That defendant waited until March 15, 2019, to file his motion for recusal is not especially long considering that Hite-Ross was not appointed to her position until November 2018, but it raises the countervailing consideration of the burden on the State's Attorney's Office if the whole office had to be disqualified. Defendant brought his motion about three years after being charged. By that time the parties had gone through extensive

discovery and the trial court had made many evidentiary rulings, including granting the State's motion *in limine* to allow into evidence the victim's dying declaration.

¶ 59    For all of these reasons, the trial court's denial of defendant's motion to recuse the Winnebago County State's Attorney's Office was not an abuse of discretion. *Cf. People v. Davis*, 2013 IL App (3d) 120469-U, ¶¶ 16, 18 (that the State's Attorney was allegedly a first cousin of the murder victim did not alone show significant emotional ties and was also insufficient to establish the appearance of impropriety).

¶ 60                                    B. Jury Instruction

¶ 61    Defendant next argues that the jury received an incorrect instruction on prior inconsistent statements during deliberations that failed to include the necessary limiting language on the use of statements attributed to defendant, resulting in plain error because the jury may have improperly used the statements as substantive evidence. Specifically, Harmon's video interview with Officer Beets included hearsay statements attributed to defendant that defendant was talking to Smith through Facebook and that Smith was coming over to Harmon's house. Before the jury watched the video, the parties agreed to the court giving a modified version of IPI Criminal No. 3.11, in which it stated, as pertinent here:

> "You are going to receive evidence concerning a statement that Martaivis Harmon
> made to Rockford Police Detectives Duane Beets and James Posley. Concerning the
> entirety of the [s]tatement you can consider it for this purpose: The believability of a
> witness may be challenge[d] by evidence that on some former occasion he made a
> statement that was not consistent with his testimony in this case. Evidence of this kind
> ordinarily may be considered by you only for the limited purpose of deciding what weight
> to be given to the testimony you heard from the witness in this Court Room. All right. *For*

*this next part you have to exclude from your brain the parts that Javontavious [sic] Benford said, and then you can consider everything that's going to be on this Statement that's being played, other than the statements that are alleged to have been made by Mr. Benford.* However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes or explains an event or condition the witness had personal knowledge of and the [s]tatement was accurately recorded by a tape recorder, video recording or a similar electronic means of sound recording.

Now this relates to the whole [s]tatement you are going to hear. It is for you to determine whether the witness made the earlier statement, and if so what weight should be given to that statement. In determining the weight to be given to an earlier statement you should consider all the circumstances under which it was made."

The trial court also read a limiting instruction to the jury following closing arguments.

¶ 62    The written instruction given to the jury stated, in relevant part:

"Detective Beets also testified as to matters that Martaivis Harmon is alleged to have personally observed. *As to those portions of his statement and not as to what Javontavious* [sic] *Benford allegedly told Martaivis Harmon*, you are instructed as follows: However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of and the *statement was written or signed by the witness*." (Emphases added.).

After the jury brought up the issue of the video recording, the State noticed that the instruction referred to being "written or signed by the witness" as opposed to being recorded. The parties

agreed to an amended instruction, and the trial court read the instruction to the jury when it re-watched the video.

¶ 63    However, the written instruction sent back to the jury the second time differed from what the trial court read aloud, in that it stated:

> "Detective Beets also testified as to matters that Martaivis Harmon is alleged to have personally observed. *As to those portions of his statement only*, you are instructed as follows: However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of and the statement was *accurately recorded by a tape recorder, videotape recording, or a similar electronic means of sound recording*." (Emphases added.).

Thus, although the revised instruction changed the reference to a written statement to referring to a recording, it left out the portion of instruction that the jury was not to consider what Harmon said that defendant allegedly told him.

¶ 64    Defendant acknowledges that he did not preserve this issue for review on appeal because defense counsel did not raise the subject in a posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but he argues that the issue constitutes plain error. The plain error doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear error occurs that is so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 21.

¶ 65    Defendant notes that although a defendant's admission is generally admissible (see *People v. Herron*, 218 Ill. App. 3d 561, 575 (1991) (the defendant's affidavit was admissible into evidence as an admission of the defendant)), the same is not true for statements attributed to a defendant in a witness's prior inconsistent statement, as they may not be considered as substantive evidence (see *People v. Wilson*, 2012 IL App (1st) 101038, ¶¶ 42-43). Defendant argues that the erroneous instruction, which did not include the language limiting the statements attributed to defendant by Harmon in the police interrogation video to impeachment purposes only, constituted a clear and obvious error here. Again, the statements that Harmon attributed to defendant in the video recording were that defendant said that he talked to Smith on Facebook and that Smith was coming over to Harmon's grandmother's house. Defendant argues that if this evidence was improperly used by the jury as substantive evidence, it would have been the sole substantive evidence that defendant and Smith communicated before the shooting. Defendant maintains that the only other such evidence of this was Wright's written prior inconsistent statement that Smith was talking to defendant on Facebook, but that statement was limited solely to impeachment purposes, and the jury was properly instructed on that limitation.

¶ 66    Defendant argues that had the jury deliberated with the proper instruction, it could have rationally acquitted defendant of first-degree murder and mob action. Regarding mob action, defendant argues that any improper substantive consideration of the statements at issue would have been used by the jury to conclude that defendant "acted together" with his codefendants. For first-degree murder, defendant argues that the lack of substantive evidence that defendant and Smith were communicating before Smith arrived would have prevented a conclusion that defendant was "engaged in a common criminal design or agreement" with Harmon and Jefferson, and supported a finding that defendant was merely present at the crime scene. Defendant contends that it appears

from the record that the jury found defendant guilty of first-degree murder based on accountability, as evidenced by the jury's note asking for "additional guidance on what 'legally responsible' for the conduct of others means," and the jury's verdicts finding that the State failed to prove the firearm enhancements that defendant was armed with a firearm, personally discharged a firearm, and personally discharged a firearm that proximately caused death or great bodily harm.

¶ 67    Defendant cites *People v. Carr*, 53 Ill. App. 3d 492 (1977), where the trial court allowed prior inconsistent statements which had not been admitted into evidence to go back to the jury room during deliberations without instructions that the statements were not to be used as substantive evidence.[3] The appellate court held that this was reversible error, stating:

> "Although the State has pointed out that the court gave I.P.I. Criminal No. 3.11, as
> to impeachment by prior inconsistent statements, we note that the instruction was
> apparently given some hours earlier along with the rest of the instructions and was not
> repeated at the time the statements themselves were given to the jury. Thus, the jury herein
> could quite easily have concluded that they could use these statements for any purposes
> they wished, including as substantive evidence of the matters stated therein. In this state
> the law is clear that prior inconsistent statements of witnesses may not be considered as
> substantive evidence by the jury and that the jury must be adequately instructed as to the

---

[3] At the time, witnesses' prior inconsistent statements could not be considered as substantive evidence. *Carr*, 53 Ill. App. 3d at 500. The law has since changed, and there is a hearsay exception in criminal cases for prior inconsistent statements under certain conditions. See 725 ILCS 5/115-10.1 (West 2018) (allowing for substantive admission of prior inconsistent statements).

limited purposes for which such evidence may be used. [Citations.] Under the circumstances of this case we are not at all sure the jury was adequately instructed with regard to the proper use of the portions of the [witness] statements which differed in part from their testimony at trial." *Id.* at 499-500.

See also *People v. Walker*, 335 Ill. App. 3d 102, 114 (2002) (trial court erred in sending a prior consistent written statement to the jury room without the proper limiting instruction that it could not be considered as substantive evidence).

¶ 68    Defendant states that the trial court read the proper limiting instruction to the jury both when the State first played the video of Harmon's interview during its rebuttal case and with the rest of the jury instructions following closing argument. However, defendant argues that like the jury in *Carr*, even though the jury was initially told the correct instruction, it then deliberated for several hours with an incorrect instruction that removed the proper limiting language.

¶ 69    Defendant argues that the evidence was closely balanced under the plain error doctrine because it hinged on Harmon's credibility, specifically whether he was more credible on the stand or in his prior inconsistent statement. Defendant argues that the evidence established that an incident occurred, but not who discharged the firearm that caused Smith's death. Defendant maintains that although the State took the position that Smith answered this question by saying that defendant shot him, Smith later stated that "They shot me." Defendant highlights that in Wright's written statement, he said that the only firearm that he saw besides the one carried by Smith was held by Harmon. Defendant argues that the jury understood that the case hinged on whether Harmon was more credible in his written statement or in his trial testimony, as the jury sent a note asking to see Harmon's recorded statement to Beets again and asked whether it could use that statement as evidence. Defendant also argues that the length of the jury deliberations

shows the closely-balanced nature of the evidence, as the first jury note was sent out at 2:20 p.m. and the jury did not return a verdict until about 10 p.m.

¶ 70    The State admits that the amended written instruction given to the jury during deliberations did not indicate how defendant's statements to Harmon could be used. However, the State argues that the error did not amount to first prong plain error because the evidence was not closely balanced and the error did not contribute to defendant's conviction. The State argues that the portion of Harmon's video recorded interview describing statements made by defendant that he was talking to Smith on Facebook and that Smith was coming over to Harmon's grandmother's house lasted about 30 seconds. The State also argues that the first three jury instructions regarding Harmon's interview contained the proper limiting language on the use of the statements made by defendant. The State maintains that even if, *arguendo*, the jury considered defendant's statements to Harmon as substantive evidence, there is no reasonable probability that the error affected the trial's result, as it was undisputed that Smith did come over to Harmon's grandmother's house and was subsequently shot inside the garage.

¶ 71    The State argues that the evidence in question was also cumulative to the other evidence adduced at trial, specifically Wright's prior written statement to the police. The State further argues that defendant's suggestion that in the absence of the instructional error, the jury could have somehow found that he was merely present at the crime scene, is speculative and belied by the record. The State contends that the evidence clearly established that defendant was an active participant in the commission of Smith's murder, in that Wright's prior written statement said that he saw defendant and Jefferson in front of the house on Parkside, and that shortly after hearing the gunshots, Wright drove around to the alley and saw defendant, Jefferson, and Harmon. After the incident, defendant drove Harmon and Jefferson to the hospital, and defendant lied to the police

there by saying that they had flagged him down and asked for a ride. The State asserts that Smith's statement "They shot me" does not absolve defendant of responsibility, because Smith was shot multiple times. The State argues that if another offender in addition to defendant shot Smith, defendant would still be guilty. The State maintains that the notion that defendant did not shoot Smith is contradicted most significantly by Smith's dying declaration, in that he specifically stated that "Tavious Benford" shot him. The State also points to Harmon's statement in the video recording that defendant had a 9-millimeter gun and that defendant and Jefferson shot Smith after Smith first shot Harmon. The State asserts that given the facts of this case, it defies common sense to believe that in the absence of the instructional error, the jury would have acquitted defendant.

¶ 72    It is undisputed on appeal that removing the limiting language from the jury instruction on Harmon's prior inconsistent statement was error. Based on the error, the jury may have wrongly considered as substantive evidence Harmon's statements in his video recorded interview that defendant said that he was talking to Smith through Facebook and that Smith was coming over to Harmon's grandmother's house. The central issue is whether the error qualifies as plain error on the basis that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *Sebby*, 2017 IL 119445, ¶ 48.  In other words, plain error under the first prong requires a finding that "the evidence is so closely balanced that the guilty verdict may have resulted from the error." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 73    Defendant was found guilty of counts 3, 5, and 42. Count 3 alleged that defendant, Harmon, and Jefferson committed first-degree murder in that defendant, knowingly and without

lawful justification, shot and killed Smith, knowing that such acts would create a strong probability of death or great bodily harm to Smith. Count 5 alleged the same except that it alleged that Smith was shot during the course of a forcible felony, mob action, in that defendant knowingly, by the use of force or violence, disturbed the public peace in that while acting together attempted to take property from Smith. Count 42 alleged that defendant, Harmon, and Jefferson committed mob action in that "said defendants engaged in the knowing or reckless use of force or violence he [*sic*] disturbed the public peace by two or more persons acting together without authority of law in trying to" take Smith's property. The jury was also instructed on principles of accountability.

¶ 74     We agree with the State that the evidence in this case was not so closely balanced that the guilty verdict may have resulted from the error. Harmon's prior statement that defendant said that he was talking to Smith through Facebook was cumulative evidence in that Wright wrote in his prior statement that Smith "was using the Facebook Messenger App to communicate with [defendant]." As Wright's statement did not indicate that this information was something Smith said to him, as opposed to something Wright personally observed, it was not hearsay and could be considered as substantive evidence. Given the evidence that defendant was communicating with Smith before Smith arrived, it is inconsequential that the jury may have improperly considered Harmon's statement that defendant said that Smith was coming over, as it is undisputed that Smith did come to Harmon's grandmother's house. Wright also stated in his statement that defendant and Jefferson were outside when he dropped Smith off.

¶ 75     Additionally, in Harmon's prior inconsistent statement, he stated that defendant had a 9-millimeter gun and that both Jefferson and defendant shot Smith. Defendant argues that the jury had to determine whether to believe Harmon's statements at trial or his prior written statement, but weighing against Harmon's trial testimony was the fact that he changed his version of events

to say that defendant was not involved in communicating with Smith or shooting him after Harmon already had a conviction in relation to this case and would not be personally affected by implicating himself.

¶ 76    Regardless, the most significant evidence against defendant was Smith's dying declaration telling the police more than once that defendant was the person who shot him. Defendant's reliance on Smith's statement that "They shot me" to raise doubts about his involvement is not persuasive, as even if the jury accepted that Smith said "They shot me" rather than "He shot me," there was evidence that more than one person shot Smith, and the jury could have also found defendant guilty based on accountability. Accordingly, the evidence was not closely balanced, such that defendant has failed to show plain error arising from the error in the amended jury instruction.

¶ 77                                III. CONCLUSION

¶ 78    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 79    Affirmed.